# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ARLENE HARRIS,

            Plaintiffs,

v.                                                                    No. 1:21-cv-01083 (GMH)

KRISTI NOEM, *et al.*,

            Defendants.[1]

## MEMORANDUM OPINION

This is an alleged employment retaliation matter involving the Federal Emergency Management Agency ("FEMA"), which is a subagency within the Department of Homeland Security headed by the Secretary of Homeland Security and FEMA's Administrator (collectively, "Defendants"). Plaintiff Arlene Harris ("Plaintiff") is a Program Analyst for FEMA and has worked there since 2009. Issues arose when Harris received an unsatisfactory performance review for the 2019 fiscal year, subsequently began communications with FEMA's Equal Employment Opportunity ("EEO") counselor, and ultimately filed a formal EEO complaint alleging various forms of discrimination. In her federal complaint, Harris initially alleged race and sex discrimination, retaliation, and the creation of a hostile work environment in violation of Title VII (Counts I, III, IV, and V, respectively) and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (Count II). The complaint survived a motion to dismiss, though just barely, with only retaliation claims remaining (Count IV, in part). Following discovery, Defendants now move for summary judgment on those remaining claims, arguing that Plaintiff has not pointed to any facts

---

[1] The current Secretary of Homeland Security and Administrator of the Federal Emergency Management Agency are substituted as Defendants pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

in the record that could lead a reasonable jury to infer retaliation.  Upon review of the record and the parties' briefs, the Court agrees and grants Defendants' motion in full.[2]

## I.    BACKGROUND

The following factual allegations are undisputed (or deemed undisputed), either because they are the subject of judicial admissions, because they appear in the record provided to the undersigned in connection with this summary judgment motion without contradiction from other evidence in the record, or because they appear in Defendants' statement of undisputed material facts and have not been properly controverted.  Specifically, the facts here come primarily from three buckets of evidence:  (1) admissions made in Plaintiff's statement of material facts, *see* ECF No. 60-6;[3] (2) Plaintiff's uncontested deposition testimony, *see* ECF No. 60-2; and (3) Defendants' statement of material facts if the facts have not been properly or sufficiently contested by Plaintiff, *see* ECF No. 55-2; ECF No. 60-6.[4]  *See* Fed. R. Civ. P 56(e).  Where a fact is explicitly admitted

---

[2] The relevant docket entries for the purpose of this Memorandum Opinion are: (1) Plaintiff's Second Amended Complaint, ECF No. 35; (2) Defendants' Motion for Summary Judgment, ECF No. 55, Memorandum in Support, ECF No. 55-1, Statement of Material Facts, ECF No. 55-2, and supporting exhibits, ECF No. 55-3–55-17; (3) Plaintiff's Opposition to Defendant's Motion for Summary Judgement, ECF No. 60, Response to Defendants' Statement of Material Facts, ECF No. 60-6, and supporting exhibits, ECF No. 60-1–60-5; (4) Defendants' Reply Memorandum of Points and Authorities, ECF No. 61, and Response to Plaintiff's Statement of Additional Material Facts, ECF No. 61-1.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] Plaintiff provides unqualified admissions to many of Defendants' enumerated facts, *see* ECF No. 60-6, ¶¶ 1–4, 6–18, 21, 25–26, 32–34, which the Court deems admitted where they are supported by the record, *see Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016).

[4] Plaintiff's statement of material facts contains persistent errors that "do[] nothing to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record." *Borges-Silva v. Nishida*, No. 21-cv-183669, 2023 WL 183669, at *1 n.3 (D.D.C. Jan. 13, 2023) (quoting *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002)); *see also* LCvR 7(h)(1) (requiring oppositions to a motion for summary judgment to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which *shall include references to the parts of the record relied on to support the statement*." (emphasis added)); Fed. R. Civ. P. 56(c) (disputed facts must be supported by record evidence).  In addition to Plaintiff's consistent failure to support her factual assertions with the record, many of her factual assertions are wrongly "blend[ed] . . . with legal argument." *Canning v. U.S. Dep't of Def.*, 499 F. Supp. 2d 14, 16 (D.D.C. 2007) (quoting *Colbert v. Chao*, No. 99-cv-625, 2001 WL 710114, at *8 (D.D.C. June 19, 2001)); *see, e.g.*, ECF No. 60-6, ¶¶ 40–50, 61, 65, 67.

For example, Plaintiff attempts to support a number of her assertions with citations to pages in exhibits that do not contain material supporting the facts alleged. *See, e.g.*, ECF No. 60-6, ¶¶ 36, 38–39, 41–42, 44–46, 48–50, 52–53, 55–58, 62–63, 73.  Defendants often respond by stating: "This fact is unsupported by the record evidence relied

by Plaintiff, the Court generally cites the Plaintiff's Response to Defendants' Statement of Material Facts. When a fact is insufficiently disputed because, for example, either Plaintiff's response presents a legal argument, fails to cite record evidence, or cites evidence that does not support Plaintiff's assertion, the Court cites either the record evidence supporting the fact or Defendants' Statement of Material Facts. All such insufficiently disputed facts—of which there are many—are noted.

Harris first joined FEMA as a Business Program Manager, a contract position, in 2009. ECF No. 60-6, ¶ 1. She became a full-time employee in 2010 when she was hired as a Budget Analyst in the Office of Mission Support. ECF No. 60-6, ¶ 1; ECF No. 60-2 at 19. Harris was promoted to Program Analyst in 2017 and remained in that position for all times relevant to this case. ECF No. 60-6, ¶ 2.

Rita Jankovich was Harris' first-line supervisor for much of Harris' time at FEMA and her performance evaluations under Jankovich were positive.[5] ECF No. 60-2 at 35; *see, e.g.*, ECF No.

---

on by Plaintiff. . . . This fails to satisfy Plaintiff's burden to identify specific facts in the record that reveal a genuine issue that is suitable for trial." *See, e.g.*, ECF No. 61-1 at 2; *see also* Fed. R. Civ. P. 56(c). The D.C. Circuit acknowledges that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support. *Jimenez v. Mayorkas*, No. 21-5193, 2023 WL 2607385, at *2 n.2 (D.C. Cir. Mar. 23, 2023) (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000)); *cf. Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in brief or the record, but also because such a rule ensures fairness to both parties." (alteration in original) (quoting *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011))). The Court acknowledges that, in some cases, support for a fact alleged may be readily discernable by a quick review of the record. But this is not such a case. Plaintiff provided the Court with over 2000 pages of exhibits, containing a full-length Report of Investigation and multiple full-length deposition transcripts, which are unedited for relevance. *See* ECF Nos. 60 through 60-5. More, Plaintiff's lengthy Statement of Additional Material Facts fails to identify any genuinely disputed material facts that require resolution by a jury and often repeats the same fact or legal argument in numerous paragraphs. *See* ECF No. 60-6, ¶¶ 35–85. Where a fact is not adequately disputed, because of one of the faults described above, the Court deems it uncontested.

[5] Plaintiff raised the fact that she received positive performance reviews before Hubbard was her supervisor throughout her response to Defendant's statement of material facts. *See* ECF No. 60-1, ¶¶ 44, 59, 79, 80. However, as Defendants note, *see, e.g.*, ECF No. 61-1, ¶ 44, Plaintiff's cited evidence does not establish that she received positive performance reviews. Instead, Harris cites a portion of her deposition testimony in which she discusses her job responsibilities. *See* ECF No. 60-2 at 20. Nonetheless, Defendants admit that Plaintiff accurately described her prior positive performance evaluations—although they argue that they are immaterial to the analysis. ECF No. 61-1, ¶ 80. Additionally,

60-1 at 139–143 (Harris' 2018 Performance Appraisal).  In July 2019, Jankovich retired, and Domenic Ionta became Harris' subsequent first-line supervisor.  ECF No. 60-2 at 36, 236.  In February 2020, Harris learned that she had received a low performance rating for the 2019 year from Ionta and was denied a bonus because of the rating. [6]  ECF No. 55-2, ¶ 5; ECF No. 60-6, ¶ 5. Harris met with Ionta; Jane Lassiter, Plaintiff's then second-line supervisor; and Amber Smith, then Chief of Staff for the Office of Mission Support, to discuss the low performance rating.  ECF No. 60-6, ¶ 6.  As a result of that meeting, by March 4, 2020, Harris' rating was raised from an "Unacceptable" to "Achieved Expectations," an overall passing score.  *See* ECF No. 60-6, ¶¶ 6–7.  Regardless, on March 9, 2020, Harris made initial contact with an EEO Counselor regarding the 2019 performance review.  ECF No. 60-6, ¶ 9.  Amber Smith was interviewed by an EEO counselor about the incident on May 1, 2020.  ECF No. 60-1 at 155.  Shortly thereafter, Harris was notified of her right to file a formal EEO complaint, ECF No. 60-6, ¶ 10, and ultimately filed one on June 16, 2020, alleging discrimination related to the 2019 performance review.  *Id.*, ¶ 11; ECF No. 55-9 at 1.

On May 26, 2020, Pamela Hubbard started working at FEMA as Director of Resource Management and became Harris' first-line supervisor.  ECF No. 60-6, ¶ 12; ECF No. 60-2 at 37.  Amber Smith became Harris' second-line supervisor, and Hubbard's immediate supervisor.  ECF

---

the Court in its independent review of the record located Plaintiff's prior performance reviews and confirms all were positive.  *see* ECF No. 60-1 at 96–131, 144–146, 271–276, 320.

[6] Harris disputes this these facts, arguing that "Plaintiff always articulates very well her competency."  ECF No. 60-6, ¶ 5.  The Court finds Plaintiff does not genuinely contest the facts asserted.  Whether Harris *believes* the low performance rating was incorrect, she does not truly contest that she received a poor performance rating for 2019, that she learned she received the poor performance rating in February 2020, or that she was denied a bonus because of the rating.  These facts are supported by the record.  *See, e.g.*, ECF No. 60-1 at 199–200 (Harris testifying to these facts in her declaration in support of her EEO complaint).  In fact, Harris relied on these facts as the basis of her initial EEO complaint, ECF No. 60-6, ¶ 9, and reiterated them again in the operative complaint for this case, ECF No. 35, ¶¶ 31–33; *see also* ECF No. 60 at 8 (citing ECF No. 60-5 at 52 (Harris citing Smith's deposition testimony and EEO declaration to establish this fact in Plaintiff's Opposition)).  Further, Harris admits that she met with Ionta, Jane Lassiter, and Amber Smith to discuss the poor performance in the next paragraph of her Response to Defendants' Statement of Material Facts.  ECF No. 60-6, ¶ 6.  In any event, the facts underlying her initial EEO compliant are not at issue and are provided here merely as background for Plaintiff's retaliation claims which are at issue.

No. 60-2 at 37–38.  From the time Hubbard became Harris' supervisor until September 2020, Harris alleges a pattern of adverse employment actions inflicted on her by Hubbard, which she attributes to retaliation for her engaging in protected EEO activity starting prior to Hubbard becoming her first-line supervisor.  *See* ECF No. 35, ¶¶ 30–47; ECF No. 60-3 at 3–9 (Harris Responses to Defendants' Interrogatories).  Specifically, Harris alleges that retaliation occurred when Hubbard (1) required Harris to work during her scheduled time off or through lunch breaks in June and July 2020, ECF No. 35, ¶ 34; (2) denied Harris' requests for leave between July and September 2020, *id.*, ¶ 36; (3) restricted Harris' work duties between July and September 2020, *id.*, ¶ 37; (4) curtailed Harris' communications with coworkers between July and September 2020, *id.*, ¶ 38; and (5) told her there would be "worse consequences" if Harris refused to sign a Performance Improvement Plan ("PIP") on August 31, 2020, *id.*, ¶ 41.

Taking those adverse actions in turn, *first* Plaintiff asserts that on June 5, 2020, Hubbard allegedly required her to work during scheduled time off.  ECF No. 35, ¶ 34; ECF No. 60-6, ¶¶ 18–19.  Plaintiff acknowledged in her deposition that during that week she was working against a deadline of the following Monday—June 8, 2020—to complete a time-sensitive budget task.  ECF No. 60-2 at 103 ("[I]t was a busy week.  Again, . . . at this moment, [it was the] busy season . . . [and FEMA was] trying to get all of the funds committed . . . . [E]verything that is not committed by Monday the 8th, then the components run the risk of losing those funds.").  On Thursday of that week, Harris had informed Hubbard that she had to take time off the following day, June 5, 2020—a Friday—starting at 10 or 11 a.m., to go to her niece's graduation.  *Id.* at 103, 105.  By that point, Plaintiff also would have expended her allowance of ten hours of overtime, so that any time worked past that point would effectively have been without pay.  *Id.* at 103.  Nevertheless, that morning, Hubbard told Harris to complete a report needed for a meeting on the

following Monday, a template for which Hubbard allegedly did not send to Harris until 11:00 a.m. *Id.* at 105–06. Harris stated that when she reminded Hubbard that she had to be done no later than 11:00 a.m. to attend the graduation, Hubbard said "she didn't care about that. Just get it done[,]" and she "berat[ed her] about a lack of time management . . ." *Id.* at 105, 107–08; ECF No. 60-1 at 211. Harris testified that she worked on the report in the car on the way to her niece's graduation. ECF No. 60-2 at 106–07. When the report was not finished by 4:30 p.m., Hubbard contacted Harris "expect[ing] everything to be done at that point[,]" and asked Harris where the report was. *Id.* at 107. Hubbard eventually finished the report around 8:00 p.m. that evening. *Id.* at 106. Because she had exceeded her allotment of overtime hours, she did not "did not put in any more over time as per instruction," meaning that time she worked on June 5 was without pay. *Id.* at 106–07. She also asserts that Hubbard's actions required her to work through lunch that day. *Id.* at 109.

Plaintiff describes two other instances where she claims work demands imposed by Hubbard necessitated her working during her scheduled time off or lunch breaks. ECF No. 60-6, ¶ 19 (citing ECF No. 60-1 at 212). One occurred on Friday, June 19, 2020. ECF No. 60-1 at 212. During that time—and starting prior to Hubbard becoming Harris' supervisor[7]—it was the policy of Mission Support that all overtime had to be approved by a supervisor. *Id.* Plaintiff had ten hours of approved overtime and had notified Hubbard that she needed to be offline by 10 or 11

---

[7] Harris stated in her EEO declaration that, prior to Hubbard starting at FEMA, a different supervisor "approached [Harris] about Amber Smith being appalled at all of the comp time that [Harris] had accumulated." ECF No. 60-1 at 212. At that time, Harris was "told verbally to stop all overtime." *Id.* However, according to Harris, "it was quickly understood that all of [her] duties could not be completed in a regular forty-hour work week, so overtime had to be regularly approved." *Id.* Thereafter, "the interim supervisor after Domenic Ionta's departure" and before Hubbard took over, informed Harris that she needed to be compensated for all her work, but "limited the extra time [Harris] could record on [her] time sheet to [ten] hours." *Id.* This policy was later applied to all employees, and "[o]n May 11, [2020,] it was announced that all overtime had to be pre-approved . . ." *Id.* "[A]fter her arrival, Pamela Hubbard continued this practice." *Id.*

a.m. on June 19 to comply with her approved overtime hours. *Id.* Later that afternoon at 4:30 p.m., Harris had scheduled a hair appointment. *Id.* But that morning, Harris had to respond to "several unscheduled but urgent calls and requests, including from [Hubbard]." *Id.* And Hubbard assigned additional work which, according to Harris, "could not reasonably be completed before [she] was scheduled to leave at 10 or 11 in the morning." *Id.* at 213. She ended up working right up to her hair appointment, and then afterwards to complete the tasks. *Id.*

The last such incident described in detail in the record occurred on July 14, 2020, and involved Harris working through lunch. *Id.* On that day, Harris asserts that "Hubbard engaged in . . . a pattern of bullying communications and forced [her] to work through lunch, by giving [her] a relentless series of tasks with short deadlines under threat." *Id.* She stated that "[u]nder these conditions, there was no opportunity either to stop and eat or to even tell [Hubbard] that I needed to stop and eat." *Id.* at 214.

*Second*, Harris alleges Hubbard denied her requests for either compensatory time off or annual leave (referred to collectively as "annual leave")[8] between July and September 2020. ECF No. 35, ¶ 36; ECF No. 60 at 13–15. During that period, all such annual leave requests by Mission Support employees had to be approved by a supervisor, an office policy that was in place before Hubbard began working as Harris' first-line supervisor. ECF No. 60-6, ¶ 21. Hubbard denied

---

[8] There is no real dispute regarding Hubbard's grant or denial of Plaintiff's requests for *sick* leave during this period. Plaintiff acknowledges that "Hubbard approved sick leave requests during this period." ECF No. 60 at 14; *see also* ECF No. 60-4 at 124 (Hubbard testifying that "of course" she "was going to approve [sick leave]"). Plaintiff asserts in passing that "records suggest that distinction between sick leave and annual leave was arbitrary and contributed to the perception that the denial of annual leave was punitive rather than operational in nature." *Id*. at 14–15. She does not further expand on this bald assertion, explain what she means by "records," or identify other evidence in the record to support it. *See id.* The Court need not respond to such throwaway arguments. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)). Rather, Plaintiff's claim is that Hubbard retaliated against her by denying her requests for either compensatory time off or annual leave between July and September 2020. ECF No. 60-4 at 67–68, 124, 145; ECF No. 60-2 at 76–78. For convenience, the Court will refer to these leave requests as "annual leave" requests.

Harris' leave requests in July, August, and September 2020.  ECF No. 60-2 at 76, 78, 81.  The reason Hubbard gave for the denials was that the leave requests fell during the fiscal year closeout; she instructed that such leave should be rescheduled for after the end of the fiscal year, October 1, 2020.  *Id.* at 78–79; ECF No. 60-1 at 251.  Nevertheless, Hubbard approved some of Harris' requests to take annual leave during this period, specifically on August 21, 2020, and August 27, 2020.  ECF No. 60-2 at 89–91.

*Third*, Harris alleges that Hubbard retaliated against her by removing some of her "core" work duties.  ECF No. 35, ¶¶ 37, 59; ECF No. 60 at 15–16.  Specifically, Harris testified at her deposition that her "spend plan," "continuing resolutions," "open commitments," "unfunded requests," and "status of funds" duties were reassigned to a newly-hired employee on September 10 and 16, 2020.  ECF No. 60-2 at 96–97.

*Fourth*, Harris alleges another instance of retaliation occurred when Hubbard told her to stop communicating with other co-workers.  ECF No 35, ¶ 38; ECF No. 60 at 17.  Specifically, on July 14, 2020, Hubbard told Harris to stop copying Amber Smith on emails because Smith was "busy."[9]  ECF No. 60-2 at 133–35.  Additionally, on that day, Hubbard told Harris to stop attending community of practice meetings—meetings Harris alleges were intended to be held with all of Hubbard's staff to provide briefing updates—because Harris "needed to work on [her] performance."[10]  ECF No. 60-2 at 72–73; ECF No. 60-4 at 88.

---

[9] Plaintiff disputes this fact arguing that "Hubbard's request for Plaintiff to stop copying emails was not an operational decision[, but] was done so that Ms. Smith would not receive the hostile and retaliatory emails from Ms. Hubbard."  ECF No. 60-6, ¶ 27.  Harris cites her own deposition testimony in which she explained that she was copying Smith on her emails to Hubbard because she felt "[t]he retaliation . . . was intense" and referenced the "tone [Hubbard] was using . . . sometimes in her e-mails."  ECF No. 60-2 at 133–34.  But Harris also testified during her deposition that "[p]er [Hubbard's] email," Hubbard explained to Harris that she asked her to stop copying Smith on emails "because [Smith is] busy."  ECF No. 60-2 at 135.  As such, the Court finds that this fact is not actually contested.  Harris' hypothesis that Hubbard's true reasoning was retaliatory is a legal argument.

[10] Plaintiff disputes this fact, citing her own deposition testimony describing the incident.  *See* ECF No. 60-6, ¶ 28.  Harris testified that she was asked not to attend meetings, including the "OCFO" meeting.  *See* ECF No. 60-2 at 72.

*Finally*, Harris asserts that Hubbard retaliated against her when, on August 31, 2020, during a mid-year performance review meeting, Hubbard indicated her intention to place Harris on a PIP.  ECF No. 35, ¶ 41; ECF No. 60-2 at 173; ECF No 60-6, ¶ 29.  Further, Harris asserts that Hubbard told her during the meeting that "if she did not sign [the PIP], things would get worse." ECF No. 60-6, ¶ 29; ECF No. 60-2 at 175.

Harris filed requests to amend her formal EEO complaint on September 1, 2020, and September 20, 2020, to include claims of discrimination and retaliation against Hubbard for the actions described above.[11]  ECF No. 60-2 at 185.  (It was not until January 26, 2021, however, that Hubbard was interviewed by an EEO Counselor about Harris' complaint and signed an EEO declaration.  ECF No. 60-1 at 798–828.)

Meanwhile, on or about September 18, 2020, Hubbard e-mailed Smith formally indicating her intention to place Harris on a PIP and to terminate her employment.  ECF No. 60-2 at 177; ECF No. 60-4 at 122.  On that same day, Harris went on an extended medical leave.[12]  ECF No. 35, ¶ 47; ECF No. 60-4 at 124 (Hubbard testifying that Harris "went out on stress . . . sometime in September").  Harris returned to full-time work on March 5, 2021, and Hubbard again indicated her intention to place her on a PIP.  ECF No. 35, ¶¶ 55–56.  Harris was eventually placed on a 30-day PIP, which she completed "successfully."  *Id.*, ¶ 56; *see also* ECF No. 60-4 at 137.  It appears

---

Harris further testified that Hubbard explained to her that she was asked not to attend meetings because Harris "needed to work on [her] performance."  *Id.*  But Harris stated Hubbard never explained what that meant.  *Id.*  As such, the Court finds the testimony cited by Plaintiff supports the fact rather than disputes it.

[11] Harris' discrimination claims against Hubbard were previously dismissed by this Court.  *See Harris v. Mayorkas*, No. 21-cv-1082, 2022 WL 3452316 (D.D.C. Aug. 18, 2022).

[12] All facts occurring after Harris' leave in late September are immaterial to Harris' remaining retaliation claims.  Although Harris challenged certain employment actions that occurred after September 2020 as retaliatory in her original complaint, *see* ECF No. 1 at 5–7, those claims were dismissed by this Court on Defendants' Motion to Dismiss for Plaintiff's failure to exhaust administrative remedies.  *See Harris*, 2022 WL 3452316, at *13–14 (dismissing all retaliation claims arising after September 17, 2020, for failure to exhaust).  For this reason, the factual record presented to support this Motion for Summary Judgment largely ends in September 2020, although Harris' relationship with FEMA continued after that date.

that Plaintiff continued to work at FEMA as a Program Analyst until at least October 6, 2022 (the date she filed her Second Amended Complaint, *see* ECF No. 35, ¶ 23) and was still employed at the agency until at least March 2024, *see* ECF No. 60-5 at 144 (Smith testifying on March 21, 2024, that she was aware Harris still worked at FEMA).

On April 4, 2021, Harris, filed her federal complaint in this Court against Defendants.  ECF No. 1.  Originally, the complaint contained Title VII discrimination claims based on race and sex; an ADEA discrimination claim based on age; and a Title VII retaliation claim.  *Id.*  Most of Plaintiff's claims were dismissed by the undersigned on August 18, 2022.  *See Harris*, 2022 WL 3452316, at *17.   Only the five retaliation claims described above remain.  *See id.*

Defendants filed their motion for summary judgment as to Plaintiff's remaining retaliation claims on June 21, 2024.  ECF No. 55; ECF No. 55-1.  They argue primarily that summary judgment should be granted in their favor because the undisputed evidentiary record establishes that Plaintiff's supervisor, Pamela Hubbard, had legitimate, non-retaliatory reasons for taking the actions she took and Plaintiff has not established facts sufficient to allow a reasonable jury to find that the actions were retaliatory.  *See* ECF No. 55-1 at 5–6.  Specifically, Defendants argue that "Plaintiff cannot create a genuine dispute as to any material fact bearing on Ms. Hubbard's honest belief that Plaintiff was not meeting her expected performance standards and instead took the actions she did because of Plaintiff's prior protected activity."  *Id.* at 22.

Plaintiff filed her opposition on August 26, 2024.  ECF No. 60.  She argues primarily that she can establish facts sufficient to create an inference of pretext, and as such the retaliation claims should go to a jury.  *Id.* at 2, 3–5.  She contends that "[t]he facts suggest a complex situation where performance evaluations, transitional supervisory periods, and the handling of [Plaintiff's] objections and the EEO complaint raise questions about fairness, discrimination, and retaliation."  *Id.* at

9. She focuses heavily on the temporal proximity between her protected activities and the adverse employment actions, arguing that it creates a genuine issue of material fact precluding the entry of summary judgment. *Id.* at 24. Harris also points to comparator evidence, "inconsistencies between FEMA's actions and its own policies, and the departure from [her] prior positive performance history" to establish facts sufficient for a reasonable jury to find in her favor on the the ultimate issue of retaliation. *Id.*

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party, *Anderson*, 477 U.S. at 252.  Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute).  Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party.  *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604).  Moreover, district courts approach summary judgment motions in employment discrimination or retaliation cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir.

1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plain-

tiff is still obligated to support his or her allegations by competent evidence. *Id.* Accordingly, a

plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.*

Additionally, pursuant to Local Civil Rule 7(h), "[e]ach motion for summary judgment

shall be accompanied by a statement of material facts as to which the moving party contends there

is no genuine issue, which shall include references to the parts of the record relied on to support

the statement." LCvR (7)(h)(1). An opposition must include "a separate concise statement of

genuine issues setting forth all material facts as to which it is contended there exists a genuine

issue necessary to be litigated, which shall include references to the parts of the record relied on

to support the statement." *Id.* A court may assume that any fact listed in the moving party's state-

ment of material facts is admitted, if "such a fact is [un]controverted in the statement of genuine

issues filed in [the opposition]," *id.*, and the court makes an independent determination that the

record supports such fact, *see Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir.

2016).[13]

Rule 56(a) and Local Civil Rule 7(h) are intended to narrow the issues for a court on a

motion for summary judgment—"a district court judge should not be obligated to sift through

hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis

and determination of what may, or may not, be a genuine issue of material disputed fact." *Burke

v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002) (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.

Cir. 1988)); *but see id.* (cautioning that dismissal of a potentially meritorious claim for failure to

---

[13] In *Winston & Strawn*, the D.C. Circuit Court clarified that despite the language of Local Civil Rule 7(b), which
provides that a court may deem a motion conceded if the non-movant fails to timely file an opposing memorandum,
"[t]he District Court 'must always determine for itself whether the record and any undisputed material facts justify
granting summary judgment [under the Federal Rules of Civil Procedure].'" 843 F.3d at 505 (citing *Grimes v. District
of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015)). Rule 56 does not allow a court to treat a motion for summary judgment
as conceded simply because it is unopposed. *Id.* at 507. However, a court may still consider a fact "'undisputed' if it
has not been properly supported or addressed as required by Rule 56(c)." *Id.*; *see* Fed. R. Civ. P. 56(e)(2).

properly respond to a summary judgment motion "should only be applied to egregious conduct" (quoting *Robbins v. Reagan*, 780 F.2d 37, 52 n.23)).

### B.    Title VII Retaliation

Title VII, 42 U.S.C. § 2000(e) *et seq.*, prohibits the federal government from retaliating against employees who complain of employment discrimination. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *Jones*, 557 F.3d at 677; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). "Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677 (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."). If the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a "legitimate non[retaliatory] reason" for the adverse employment actions. *Jones*, 557 F.3d at 677 (quoting *Wiley*, 511 F.3d at 155 ).

On a motion for summary judgment, if the employer establishes a legitimate nonretaliatory reason, the court should not consider whether the plaintiff has established a prima facie case. *Id.* at 678 ("At this stage in the litigation, . . . asking whether [the plaintiff] satisfied his prima facie burden is an unnecessary and improper 'sideshow.'" (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). Instead, "the burden-shifting framework disappears, and a court . . . looks to whether a reasonable jury could infer . . . retaliation from all the evidence." *Id.*

at 677.  At this point, "the only question is the 'ultimate factual issue in the case'—'[retaliation]

*vel non*.'"  *Id.* at 678 (quoting *USPS Bd. of Gov. v. Aikens*, 460 U.S. 711, 714–15 (1983)); *see also*

*Brady*, 520 F.3d at 494 ("[B]y the time the district court considers an employer's motion for sum-

mary judgment . . . , the employer ordinarily will have asserted a legitimate, non-[retaliatory] rea-

son for the challenged decision—for example, through a declaration, deposition, or other testimony

from the employer's decisionmaker.").  In other words, "the only question is whether the em-

ployee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by

[showing] that a [retaliatory] reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence.'"  *Jones*, 557 F.3d at 678 (first

alteration in original) (quoting *Aikens*, 460 U.S. at 716).  The court should consider all evidence

in the record, including evidence introduced to support the prima facie case; evidence of pretext—

evidence the plaintiff offers to "attack the employer's proffered explanation;" and other evidence

of retaliation.  *Id.* (quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir.

2004)).

### III.    ANALYSIS

Again, Harris' remaining retaliation claim is based on five adverse actions which occurred

between June to September, 2020: namely Hubbard allegedly (1) requiring Harris to work during

scheduled time off or through lunch breaks, (2) denying Harris' requests for annual leave; (3)

reassigning Harris' work duties; (4) curtailing Harris' communications with other co-workers; and

(5) indicating her intention to place Harris on a PIP and telling her that "if she did not sign it, things

would get worse."  *See* ECF No. 60 at 2–3; ECF No. 60-2 at 175.  The Court finds that Defendants

have proffered legitimate, non-retaliatory explanations for each adverse action.  *See* ECF No. 55-1

at 20–24.  But as explained in detail below, Harris has not met her burden of establishing that a

reasonable jury could find Hubbard's explanations were pretext and she was motivated by retaliation.  As such, the Defendants' motion for summary judgment must be granted.

### A.    Defendants have presented legitimate, non-retaliatory reasons for each adverse employment action.

Although the D.C. Circuit has stressed that the primary focus of the *McDonnell Douglas* test at the summary judgment stage should be the third prong—whether evidence in the record supports an ultimate inference of retaliation, *see Brady*, 520 F.3d at 494, this "does not pretermit serious deliberation at the second prong," *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).  An employer must still "clearly present[] a [non-retaliatory] reason" it took the adverse employment actions at issue.  *Figueroa*, 923 F.3d at 1086 (citing *Brady*, 520 F.3d at 494); *see id.* at 1087 ("[T]he *Brady* shortcut only applies if the parties properly move past the second step." (citing *Brady*, 520 F.3d at 494 n.2)).  "Failing to articulate such a reason properly 'is the legal equivalent of . . . having produced no reason at all." *Id.* at 1087 (alteration in original) (quoting *Patrick v. Ridge*, 394 F.3d 311, 320 (5th Cir. 2004)).  To determine whether an employer has adequately proffered a non-retaliatory reason, courts may consider numerous factors.  *Id.*  The D.C. Circuit Court has stated that the following four factors are "paramount in the analysis for most cases."  *Id.*  First, a court may consider the admissibility of the evidence presented—the "employer must produce evidence that a factfinder may consider at trial (or at a summary judgment proceeding)."  *Id.* (citing *Segar v. Smith*, 738 F.2d 1249, 1268 (D.C. Cir. 1984) (noting evidence must be admissible)).  Second, a court may consider whether, if the factfinder believed the evidence, it could reasonably find that the employer's actions were motivated by non-retaliatory reasons.  *Id.*  In other words, the employer must create a genuine issue of fact as to whether it intentionally retaliated against the employee.  *Id.*  Third, a court may consider whether the explanation is "facially 'credible' in light of the proffered evidence."  *Id.* at 1088 (citing *Bishopp v. District of*

*Columbia*, 788 F.2d 781, 788–89 (D.C. Cir. 1986)).  Finally, because a primary focus of the second prong is to provide the employee "a full and fair opportunity" to challenge the employer's explanation as pretextual, a court may consider whether the proffered explanation is "clear and reasonably specific." *Id.* (first quoting *Lamphear v. Prokop*, 703 F.2d 1311, 1316 (D.C. Cir 1983); and then quoting *Segar*, 738 F.2d at 1269 n.13).  "[O]ffering a vague reason[] is the equivalent of offering no reason at all." *Id.* at 1092.

Defendants argue that "[t]he undisputed evidentiary record reveals that Ms. Hubbard had legitimate, non-retaliatory reasons for taking the actions that she took." ECF No. 55-1 at 5.  For three of the adverse actions—Hubbard's reassignment of Harris duties to another employee, her curtailing of Harris' communications with her co-workers, and her intention to place Harris on a PIP and warning her that if "she did not sign it, things would get worse"—Hubbard proffers her legitimate reasons were performance based. *Id.* at 23–24.  That is, Hubbard says she took these three actions because she "did not believe the Plaintiff was performing the core aspects of her job to a satisfactory level" and was continually submitting untimely work, all during FEMA's Office of Mission Support's busiest, fiscal year-end closeout period. *Id.* at 5.

To understand Hubbard's proffered reasons, some additional detail about Plaintiff's job and Hubbard's assessment of her performance is necessary.  At the time of the adverse actions at issue—during the late spring and summer of 2020—Plaintiff was a Program Analyst in FEMA's Office of Mission Support.  ECF No. 60-6, ¶¶ 1–2; ECF No. 60-2 at 19.  As a Program Analyst, Harris' primary job function was "to work on current budget year execution" and provide "in depth analysis of financial data" to FEMA leadership.  ECF No. 60-4 at 21–23; ECF No. 60-2 at 40.  Hubbard testified that on a daily basis Harris was responsible for "reviewing [FEMA's] current year funding[,] . . . going into the system looking at [the] status of funds, informing [Hubbard] and

leadership of the execution status or execution rates at that time[, and] . . . coordinating with the components[14] to understand . . . unfunded requirement needs." ECF No. 60-4 at 21–23. Additionally, in conjunction with Harris' requirement to brief leadership, Harris was responsible for preparing presentations "showing the execution status, showing a listing of the unfunded requirements and how they're prioritized, [and] making a recommendation to leadership on ones that we can fund versus ones that we have to wait on."[15] *Id.* at 24. Crucial to Harris' job as a Program Analyst was the time leading up to FEMA's fiscal year close out—from July to the end of September. *See id.* at 67, 77 (noting that July through September 30 was the fourth quarter of the fiscal year). During this time, it was "imperative for [Harris and Hubbard] to work with our components to understand what unfunded requirements were needed." *Id.* at 77; *id.* at 67 ("Harris'[] position . . . [is] working heavily with the components to understand their needs[,] . . . with contracting to understand if they need additional reports or additional purchase requisitions to award a contract[,] . . . [and] to understand if the commitments are making it through [] award to obligation."). Hubbard specifically testified that "Harris had a lot of deadlines approaching our fiscal year-end." *Id.* at 72. Additionally, Hubbard testified that she "[came] from a school of thought" where at "fiscal year-end, it's all hands on deck[,]" noting that during the fourth quarter "it was in the best interest that we all be online and processing." *Id.* at 68.

Hubbard testified that she initially had a positive impression of Harris' work performance. *See id.* at 116 ("[I]n terms of assessing her skill and ability, my first impression [was] that she

---

[14] Hubbard describes the "components" as the "offices that [the Office of Mission Support] supported." ECF No. 60-4 at 19. For example, components included FEMA's offices of human capital, procurement, the security office, and the administrative office. *Id.*

[15] Harris described her job responsibilities similarly. *See* ECF No. 60-2 at 20–25. She testified that she "dealt with budget execution[,]" which entailed "work[ing] analysis . . . and the complicated spend plan[,] . . . prepar[ing] reports that showed what was actually executed[,] . . . show[ing] how and where funds were needed[, and] . . . work[ing] with unfunded requests." *Id.* at 20. Additionally, Harris testified that she "dealt with the closeout" and was the liaison for multiple components within Mission Support. *Id.* at 21–22.

seemed like a person who knew about the job, knew the reports[,] . . . and she talked about how she communicated with the components[.]").  But as "time went on," Hubbard "started to . . . really look at some of the work that was being presented" and recognized performance issues.  *Id.* at 117.  For example, Hubbard testified about an instance in July 2020 in which Smith asked Harris to provide a report on whether certain unfunded reports were scalable, and how the requirements should be prioritized by leadership.  *Id.* at 77.  But when Hubbard received Harris' report, she realized it did not include any of the information that Hubbard had previously asked her to include.  *Id.* at 77–78.  As a result, Hubbard stated that she and Smith had to complete the report to ensure it was timely submitted.  *Id.* at 78.  Hubbard further testified that she was surprised that Harris lacked "institutional knowledge about [FEMA]" and stated she often had to provide Harris "step by step instructions" on how to complete assignments.  *Id.* at 82.  Additionally, Hubbard testified that she had difficulty reaching Harris during work hours.  *See, e.g.*, *id.* at 107–08.  Hubbard also noticed that Harris was failing to complete assignments on time.  *Id.* at 111.  For example, Hubbard testified as to one instance in which she assigned Harris a project to be completed within an eight-hour workday but that she did not receive the project from Harris until 2:00 a.m.  *Id.* at 111–12.

Thereafter, Hubbard says she began meeting with Harris to discuss these performance issues.  *See id.* at 82 (Hubbard testifying that she had "several Teams calls" with Harris to try to "resolve" the ongoing issues).  When Hubbard was unable to resolve the issues with Harris one-on-one, she communicated her concerns to leadership.  *Id.* at 83; *see also* ECF No. 60-5 at 94 (Smith testifying that Hubbard informed her Harris' "performance was not where she would expect it to be"); *id.* at 111–12 (Smith testifying that Hubbard continually provided her feedback about Harris' poor work performance during 2020).  But despite these attempts, Hubbard says Harris

failed to complete the majority of her assignments for the 2020 fiscal year, a fact Harris admits. ECF No. 60-4 at 122–23; ECF No. 60-6, ¶ 17.

According to Defendants, "Plaintiff's continuing subpar work performance" was the reason that Hubbard reassigned Harris' work duties between July and September 2020. ECF No. 55-1 at 23. Defendants point to both Hubbard's and Harris' deposition testimony as support for this assertion. *See id.* at 15–16 (citing ECF No. 60-4 at 97–98; ECF No. 60-2 at 97, 131); *id.* at 23 (citing ECF No. 60-2 at 132). Hubbard testified that, as the office approached the fiscal year-end closeout, that she had "constantly gone back and forth with [Harris]" to get her to complete her projects, but "it just wasn't happening." ECF No. 60-4 at 97. It was at that point "when [Hubbard] asked another employee" to "help in getting the task completed so that [the office] can meet [its] deadline." *Id.* at 97–98. Hubbard emphasized that this was not a permanent re-assignment of Plaintiff's duties, but that she was merely asking the other employee "to step in and help out" because the office was at risk of missing its year-end deadline. *Id.* at 98. For her part, Harris testified that, although Hubbard did not always give her a reason for reassigning her work, she did, on multiple instances, tell Harris that she viewed her performance as unsatisfactory.[16] ECF No. 60-2 at 132 (affirming that when Hubbard "provide[d] an explanation [for reassigning work], it was that she told [Harris] that she viewed [Harris'] performance as unsatisfactory"); *see also id.* at 131 ("[Hubbard] said I'm going to give this to [another employee] because you are not performing."); ECF No. 60-6, ¶¶ 25–26 (admitting Hubbard reassigned Harris' duties "due to [her] failure

---

[16] Not surprisingly, Harris disputes Hubbard's assessment of her work performance, arguing that she was competent to do her work, ECF No. 60-6, ¶¶ 69, 70, 71, 73, 74, and that she received positive performance reviews in the past, *see id.*, ¶¶ 44, 59, 79, 80. Those assertions are addressed in the analysis below. This section, however, addresses Hubbard's impressions of Harris' work performance that forms the basis of the explanation she offers for the performance-based employment actions she took.

to complete the projects in a timely manner and due to work performance that Ms. Hubbard viewed as unsatisfactory").

Defendants' proffered reason for Hubbard restricting Harris' communications with co-workers, either specifically or by instructing Harris not to attend meetings, is also performance related. *See* ECF No. 55-1 at 23. Defendants assert that Hubbard asked Harris not to attend meetings "to prioritize other incomplete assignments so that [she] could do a better job of meeting deadlines . . ." *Id.* In support, Defendants point to Hubbard's deposition testimony as well as an email in which she explicitly told Harris not to attend a meeting to "focus on her assignments." *Id.* at 16–17 (citing ECF No. 60-4 at 89–90; ECF No. 55-16 at 1 (stating in email dated July 14, 2020, "Please do not attend the community of practice meeting or the OCFO meeting until further notice. You need to work on your performance. I will provide more details tomorrow . . .")). Similarly, Hubbard testified that she started having one-on-one meetings with Harris because "we were approaching fiscal year-end, and . . . [Hubbard was] seeing that some of the deadlines [were] not being met." ECF No. 60-4 at 89. She further testified that, during that time, she "said [to Harris], since we're not meeting our deadlines, you probably don't need to bother coming to the community of practice meetings. Just focus on getting these projects done." *Id.* Although Hubbard testified that she did not instruct Harris not to communicate with her co-workers, ECF No. 60-4 at 96, Defendants acknowledge that Hubbard told Harris to stop copying Smith—Hubbard's supervisor—on emails "because Ms. Smith was busy." ECF No. 55-1 at 23. Defendants point to Harris' deposition testimony to support this fact, in which Harris stated that "Hubbard told me to stop sending or copying Ms. Smith," ECF No. 60-2 at 133, and "[p]er [Hubbard's] email, she said [Smith is] busy," *id.* at 135.

Similarly, Defendants state that Hubbard discussed with Plaintiff the need for a PIP on August 31, 2020, because Plaintiff was not meeting her performance goals. ECF No. 55-1 at 24. Defendants again point to Hubbard's testimony in which she stated she had "advised [] Harris of her performance" and stressed the need to "improve [her] performance" but "felt like it was falling on deaf ears." ECF No. 60-4 at 126. For this reason, Hubbard "started to . . . meet with Labor Relations to get an understanding of . . . next steps to try to help [Harris] improve her process. And . . . that's where the . . . PIP came [into] play." *Id.*

Neither of Defendants' explanations for the remaining two adverse actions—Hubbard denying Harris' requests for annual leave or allegedly requiring Harris to work during her scheduled time off or through lunch breaks—are directly focused on Plaintiff's unsatisfactory job performance. *See* ECF No. 55-1 at 22–23. Rather, Defendants assert that Hubbard denied Plaintiff's request for annual leave between July and September 2020 pursuant to her policy to generally deny such requests for all her employees as the end of the fiscal year approached "out of concern for making sure the[] office completed all necessary end-of-year budget tasks." ECF No. 55-1 at 23. This allegation is supported by testimony from both Hubbard and Smith. *See* ECF No. 60-4 at 66–68; ECF No. 60-5 at 151. Specifically, Hubbard testified:

> Realizing that annual leave had been put in not only by Ms. Harris, but by my entire staff, and because I had been briefed by leadership that deadlines were being missed, I needed to get some type of process in place so that we could meet our deadlines . . . . I had a meeting with everybody to let them know that during these months, which were the latter part of July, August, and September, [we] were going into fiscal year-end close. . . . And so, understanding the requirements that were going to be needed to close out fourth quarter, it was in the best interest that we all be online and processing.

ECF No. 60-4 at 66–68. Smith testified that she had conversations with Hubbard about managing annual leave around the end of the fiscal year. ECF No. 60-5 at 151. She explained that "[i]t

22

wouldn't surprise [her] if [Hubbard] put some level of leave . . . restriction in place.  Because as a budget shop, at the end of the fiscal year, that is fairly standard practice."  *Id.*

Finally, with respect to Harris working during her scheduled time off or through lunch breaks in June and July 2020, Defendants note that Hubbard did not expressly instruct Harris—or any of her employees—to work during their time off, but merely expressed to her that she needed to complete projects by a certain deadline.  ECF No. 60-4 at 130 (Hubbard testifying that she "never once told any of [her] staff [to] work during their lunch break"); ECF No. 60-1 at 803–04 (Hubbard stating that she "never asked any of my employees to work during lunch or their day off" in her EEO declaration).  Harris admits as much, but states that it was impossible to complete the work by the deadline set by Hubbard without working outside normal business hours, including during her lunch breaks.  *See* ECF No. 60-2 at 113–14 (Harris testifying that while Hubbard did not use "[the] sentence" that she was "not allowed to take [her] lunch break until [she] complete[d] this assignment," Hubbard's "actions implied that [she] [could not] take [her] lunch" because "[t]he tasks were too large to get them done in [the] time frame" imposed by Hubbard).  For her part, Hubbard, testified that she believes that the work assigned to Plaintiff—and others in the Office of Mission Support—"didn't require them to work during their break time, [or] during their overtime."  ECF No. 60-4 at 130; *see also* ECF No. 60-1 at 803–04.  For Hubbard, the issue was one of time management.  *See* ECF No. 60-4 at 129–31.  She noticed that Harris and others in the Office of Mission Support were not completing their assigned work within the normal eight-hour workday and were instead requesting "a lot of . . . comp time or credit hours"—a form of over-time—to complete their work.  *Id.* at 129–31; *see also* ECF No. 60-1 at 803 (Hubbard averring that "[w]hat I found during my observation coming on board, was that Ms. Harris would be given a task at the beginning of the day and then she would take all day to complete the task that required

maybe an hour of her time. . . . Ms. Harris is a GS-14 and is supposed to be a seasoned budget analyst and with this, she has the knowledge and skill set to complete her assigned duties within the required timeframe.  Ms. Harris constantly requested overtime  . . . more so than anyone within the crew, but with no productivity to back it up.").  For this reason, Hubbard asserts that she began to question the "techniques that [Harris and others in Mission Support were] using to meet the deadlines."  ECF No. 60-4 at 130.  Accordingly, she "made it clear to everyone within Mission Support" that "going forward [they] must submit [] credit hours and . . . comp time to [her] in advance."  *Id.* at 131.

On that record, the Court finds that Defendants have met their burden of proffering legiti-mate, non-retaliatory reasons for each challenged adverse employment action.  *See* ECF No. 55-1 at 22–24.  Harris does not contest or object to the admissibility of Defendants' proffered evidence in her opposition, and the Court does not perceive any significant flaw in that regard.  *See Hogan v. Hayden*, 406 F. Supp. 3d 32, 43 (D.D.C. 2019) (skipping over the first *Figueroa* factor when not challenged by the plaintiff).  As for the substance of Defendants' proffered explanations for Hubbard's actions, three of those actions rest primarily on on Hubbard's belief that Harris was not performing satisfactorily.  If the factfinder believes the employer's showing in that regard, the "dissatisfaction with an employee's performance" that it demonstrates "is a legitimate, non-[retal-iatory] reason for an adverse action."  *Id.* at 44 (citing *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997) (finding that proffer of negative performance evaluations satisfied the employer's burden)); *see also id.* (finding that emails showing that the employer was "critical" of its staff were sufficient evidence).  The Court also finds that the government's showing is "clear and reasonably specific" and "facially 'credible' in light of the proffered evidence."  *Figueroa*, 923 F.3d at 1088.  Defendants have presented testimonial evidence that Hubbard was dissatisfied

with Harris' performance, including testimony from Plaintiff herself confirming that Hubbard told her on multiple occasions that she was unhappy with her performance. *See, e.g.*, ECF No. 60-2 at 132 (discussing instances when Hubbard told Harris she was dissatisfied with her performance).

Courts have acknowledged that enforcement or application of facially nondiscriminatory policies may constitute a legitimate reason, so long as the reasoning includes "explanation as to how the employers applied their standards to the employee's particular circumstances." *Figueroa*, 923 F.3d at 1088. Here, Defendants point to Hubbard's policy of denying all employees' annual leave requests during the fiscal year close out as an explanation for denying Harris' specific leave requests and support this explanation with testimonial evidence concerning the importance of her job function at the end of the fiscal year. *See* ECF No. 60-4 at 66–68 (Hubbard testimony noting, among other things, that "[f]or Ms. Harris's position, fiscal year-end close was very crucial to performing her job functions because that's closing out the fiscal years."); ECF No. 60-5 at 151 (Smith testimony)). The Court finds that, again, the government's showing is "clear and reasonably specific" and "facially 'credible' in light of the proffered evidence." *Figueroa*, 923 F.3d at 1088.

Similarly, the Court finds that Hubbard's explanation is sufficient with respect to Harris' assertion that she was made to work through her lunch break or on scheduled time off to complete her assignments. That is, it is a legitimate, non-retaliatory explanation that Hubbard believed that the work she assigned to her employees within the Office of Mission Support (including Harris) was not so onerous as to "require them to work during their break time [or] during their overtime," and to the extent any of them felt they needed to do so to get their work done, it was because some of her employees (including Harris) had issues with time-management. ECF No. 60-4 at 130–31; *see also* ECF No. 60-1 at 803–04. As such, the Defendants have met their burden to establish

legitimate, non-retaliatory reasons for the employment actions at issue, and the analysis can move to the third stage.

Plaintiff's other arguments seeking to avoid that result fail because they are little more than assertions that the Defendants' explanations are pretextual, rather than—as is permitted by *Figueroa* at the second stage of the analysis—challenges to the admissibility, facial credibility, or sufficiency of the evidence presented to support those explanations. *See, e.g.,* ECF No. 60 at 30 (challenging Defendants' explanation that "Ms. Hubbard deni[ed] leave requests [as part of] a uniform policy applied to all employees . . . does not negate the potential for these denials to be retaliatory"), 31 (challenging Defendants' "subjective assessment of Harris's performance and re-assignment [of duties]" at the second stage of the analysis as "rais[ing] questions about the pre-textuality of these actions" and arguing that Defendants' explanation for the "directive from Ms. Hubbard for Harris not to attend meetings and to limit communications, particularly with Ms. Smith . . . must be scrutinized for its potential to isolate Harris and deter her from engaging in protected activities"), 31–32 (challenging Defendants' explanation of "a Performance Improve-ment Plan (PIP) by Ms. Hubbard . . . and the absence of PIP paperwork at the meeting" as "rais[ing] significant concerns about the pretextual use of performance evaluation as a retaliatory measure"). These arguments miss the mark but will be considered at the third stage of the analysis. *See Jones*, 557 F.3d at 679 (noting that a court considers pretext evidence at the third stage to determine whether a reasonable jury could infer retaliation).

The Court now proceeds to that ultimate question—whether Plaintiff has pointed to suffi-cient evidence in the record to support an ultimate interference of a retaliatory motive for the ad-verse employment actions at issue.

**B.    Plaintiff has not met her burden of establishing facts at issue that would permit a jury to reasonably infer that the Defendants' non-retaliatory reasons are false, and that Hubbard was motivated by retaliation.**

At the third stage of the analysis, Plaintiff is required to identify evidence in the record from which a reasonable jury could conclude the employer's proffered reason is pretextual and that the real reasons were retaliatory. *Jones,* 557 F.3d at 677. At this stage, the Court must determine whether retaliation could be inferred from all the evidence, including "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Carter*, 387 F.3d 872, 878 (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)). Additionally, the Court may consider any "contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Aka*, 156 F.3d at 1289.

Notably, Harris offers no direct evidence of Hubbard's alleged retaliatory motive. The record contains no statements attributable to Hubbard indicating that she was angered by being a target of Harris's EEO complaint. (Indeed, there is no direct evidence that Hubbard was even aware of Harris' complaint when she took the actions at issue—more on that later.) But the absence of direct evidence of motive is not unusual in cases involving alleged discrimination or retaliation. Rather, most stand or fall based on the sufficiency of the plaintiff's circumstantial evidence and the reasonable inferences that may be drawn therefrom concerning the decisionmaker's motivation. Harris follows that well-trodden path here. She contends that she has identified sufficient circumstantial evidence to support a reasonable inference of pretext—and therefore an ultimate inference of retaliation—based primarily on the temporal proximity between her protected

EEO activity and the adverse employment actions at issue. ECF No. 60 at 24. She adds to that showing evidence of comparator employees who she says did not exercise their EEO rights and were not subject to the same adverse actions that she was. *Id.* She also points to other positive evidence of inconsistencies between the Defendants' actions and FEMA policies and her subjective belief in the sufficiency of her performance, supported by past positive performance reviews from supervisors other than Hubbard. *Id.*

Defendants respond that Harris cannot establish that FEMA's actions were pretextual because she has not presented sufficient evidence for a reasonable factfinder to conclude either that Hubbard knew of Plaintiff's protected activity, or that she did not honestly believe the reasons she offered for the actions she took, including, most significantly, that Harris suffered from performance issues. ECF 55-1 at 24–30. Defendants also challenge the comparator employees that Harris identifies as being legally insufficient because of material differences between them and Harris and argue that other positive evidence in the record supports the non-retaliatory explanations offered for the adverse actions at issue, thereby undermining any reasonable inference of pretext. *Id.*

For the reasons stated below, the Court agrees with Defendants and finds that Plaintiff has not met her burden of identifying evidence sufficient to support an ultimate, reasonable inference of retaliation. Plaintiff's argument rests chiefly on the temporal proximity between her protective activity and the adverse employment actions at issue. But the D.C. Circuit has held that "positive evidence beyond mere [temporal] proximity" is required to rebut an employer's legitimate, non-retaliatory explanations for adverse actions taken against an employee. *See, e.g.*, *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir 2020) (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015); *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011); *Taylor*

*v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009). Although Plaintiff attempts to point to other "positive" evidence of pretext, as explained below, that evidence is insufficient to establish a reasonable inference of retaliation. Additionally, contrary evidence in the record supporting Defendants' non-retaliatory explanations, including—significantly—testimony provided under oath that Hubbard was not aware of Harris' protected EEO activity until months after the adverse actions occurred, make an ultimate, reasonable inference of retaliation untenable in this case. As such, Plaintiff's claims do not survive summary judgment.

      1.    Harris' temporal proximity evidence alone is insufficient to support an ultimate inference of retaliation when viewed against evidence showing Hubbard did not know of Harris' protected EEO activity.

As stated, Harris relies heavily on the temporal proximity between her protected EEO activity and the adverse employment actions at issue to support an ultimate inference of retaliation. It is a theme she advances repeatedly throughout her opposition to summary judgment. *See* ECF No. 60 at 3 (arguing that "the close temporal proximity between the plaintiff's EEO complaint and . . . the[] actions in early June 2020 and beyond, raises a genuine issue of material fact regarding the retaliatory nature of these actions"); *id.* at 4 (noting that the "timing" of Hubbard's threat to place Plaintiff on a PIP "supports an inference of retaliation"); *id.* at 12 (noting that the requirement to work on June 5, 2020, was "particularly concerning given the timing"); *id.* at 14 (arguing that the "timing of the leave denials, closely following Harris'[] engagement in protected EEO activity, is . . . suggestive of a retaliatory motive"); *id.* at 15 (asserting that the "proximity" of the reassignment of Harris' duties "to Harris'[] prior EEO complaint is notable"); *id.* at 16 (arguing that the "sequence of events . . . suggests retaliatory motive"); *id.* at 17 (suggesting that the "timing of these restrictions, following Harris'[] EEO complaint" suggests it "may have been a retaliatory measure"); *id.* at 21 (noting that evidence "such as the timing of adverse actions following [Harris']

EEO complaint" raise genuine issues); *id.* at 24 ("The close temporal proximity between the pro-
tected activity and the adverse actions . . . create genuine disputes of material fact . . . ."); *id.* at
32–36 (arguing that Plaintiff can establish Hubbard's knowledge of Plaintiff's protected activity
through the timing of Hubbard's actions relative to the protected activity); *id.* at 37 (noting that
the Court could "infer retaliation from a sequence of events . . ."); *id.* at 38 (noting that "timing
can be a significant factor in establishing a causal connection between protected activity and ad-
verse action"); *id.* at 41 (arguing "timing . . . surrounding the hiring of additional staff, especially
if it occurred after or in response to the plaintiff's EEO activity, could still support an inference of
retaliation"); *id.* at 42 (stressing that the Court must consider the "the timing of these actions rela-
tive to the plaintiff's protected activity").

In considering that evidence, Harris is correct that, as a general matter, temporal proximity
between an adverse action and an employee's protected activity "is a common and highly probative
type of circumstantial evidence of retaliation." *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015);
*see also Jones*, 557 F.3d at 679 (noting that "evidence sufficient to support a prima facie
case . . . applies to the ultimate inquiry as well"). Further, it is well established that a plaintiff at
the summary judgment stage can establish, by inference, the causation element of a Title VII *prima
facie case* based on mere temporal proximity, provided that the temporal proximity is "very close."
*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Allen*, 795 F.3d at 46 ("[E]vi-
dence of a pattern of antagonism following closely on the heels of protected activity and related to
the challenged employment action may establish the causation element of a Title VII plaintiff's
*prima facie case*." (emphasis added)).

There is no bright-line rule to determine how close the protected activity must be to the
adverse actions to be considered "very close," but generally "three months is perceived as

approaching the outer limit." *Greer v. Bd. of Trustees of Univ. of Dist. of Columbia*, 113 F. Supp.

3d 297, 311 (D.C. Cir. 2015); *see also Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478

F.3d 364, 369 (D.C. Cir. 2007) (per curiam) (noting that the Supreme Court in *Breeden* cited with

approval circuit cases accepting temporal proximity of three and four months as evidence of cau-

sation), *abrogated on other grounds by Green v. Brennan*, 578 U.S. 547 (2016); *Rattigan v. Gon-

zales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007) ("This Court has often followed a three-month rule to

establish causation on the basis of temporal proximity alone."). And "[f]or purposes of analyzing

temporal proximity, the courts in this Circuit look at not only the filing of the complaint, but also

subsequent protected activity." *Turner v. U.S. Capitol Police Bd.*, 983 F. Supp. 2d 98, 108 n.5

(D.D.C. 2013), *aff'd*, 653 F. App'x 1 (D.C. Cir. 2016).

Here, the Court has previously found at the motion to dismiss stage that the temporal prox-

imity between Plaintiff's protected activity and the remaining adverse employment actions is suf-

ficient to create an inference of causation to support Plaintiff's prima facie case. *See Harris*, 2022

WL 3452316, at *14. At this later stage, evidence in the record concerning the timeline of the

operative events continues to support such a finding. Plaintiff's initial protected activity came on

March 9, 2020, when she made initial contact with an EEO counselor regarding her 2019 perfor-

mance review. ECF No. 60-6, ¶ 9. The first adverse action at issue—Hubbard requiring Plaintiff

to work on her scheduled day off—occurred on June 5, 2020. ECF No. 60-2 at 102. Although this

pushes up against the three-month window, reasonable inferences must be drawn in the light most

favorable to the nonmoving party at the summary judgment stage. *See Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). As such, the Court finds that the evidence

of temporal proximity supports an inference of causation and is helpful in establishing the ultimate

issue of retaliation *vel non*, although, as discussed further below, not conclusive on that issue. The

same is true of the other adverse employment actions at issue. Harris' next protected EEO activity occurred on June 16, 2020, when she filed a formal EEO Complaint. ECF No. 60-6, ¶ 11. This was followed by a string of adverse actions beginning in June and lasting through September 2020. *See* ECF No. 60 at 12–19. The proximity between Harris' EEO activity and the remaining adverse actions at issue fall within the three-month window judges in this Circuit have considered to be appropriate for establishing an inference of causation. This inference, in turn, helps to establish the ultimate question of retaliation *vel non*. *See Jones*, 557 F.3d at 679 ("Of course, that such evidence would show intent at the prima facie stage does not resolve the question of retaliation *vel non*. Yet the reason we deem such evidence sufficient to support a prima facie case—that is tends to support a circumstantial inference of retaliation—applies to the ultimate inquiry as well.").

But the D.C. Circuit has also repeatedly held that "the fact that [an] adverse action follows closely after an employee's protected assertion of rights is not, *by itself*, enough to survive summary judgment" on the ultimate issue of a retaliatory motive. *Allen*, 795 F.3d at 47 (emphasis added). Rather, at the third step of the *McDonnell Douglas* analysis, after "an employer has put forth legitimate, non-retaliatory reasons for a challenged action, 'positive evidence *beyond mere proximity* is required to defeat the presumption that the proffered explanations are genuine.'" *Id.* (emphasis added) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1359 (D.C. Cir. 2012)); *see also Waggel*, 957 F.3d at 1376 ("While timing can establish a *prima facie* case of retaliation, dislodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires 'positive evidence beyond mere proximity.'" (quoting *Minter*, 809 F.3d at 71–72)); *Talavera*, 638 F.3d at 313 ("Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, 'positive evidence beyond mere proximity is required to defeat

the presumption that the proffered explanations are genuine.'" (citation omitted) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007))).

The picture for Plaintiff is further complicated because to prove unlawful retaliation she, of course, must "show that [Hubbard], who made the [adverse employment actions at issue], had knowledge of her protected activity." *Talavera*, 638 F.3d at 313 (citing *Jones*, 557 F.3d at 679); *see also Dudley v. Wash. Metro Area Transit Auth.*, 924 F. Supp. 2d 141, 182 (D.D.C. 2013) (observing that "[i]t is hard to argue that the employer punished plaintiff because of plaintiff's protected activity, if the employer was completely unaware of plaintiff's protected activity" (emphasis omitted)). Here, however, there is no direct evidence that Hubbard had knowledge of Plaintiff's protected activity when she engaged in the adverse employment actions at issue in the late spring and summer of 2020. *See* ECF No. 55-1 at 25. First, Hubbard was not the subject of any of the EEO complaints that covered the period prior to April 2020; they all predated her employment with FEMA which began on May 26, 2020. *See* ECF No. 60-6, ¶¶ 78-81 (describing Plaintiff's EEO complaint as being based on a February 2020 performance evaluation); ECF No. 60-1 at 800 (Hubbard averring that "I was not employed with FEMA during these timeframes. I began employment with FEMA on May 26, 2020."). More, both Hubbard and Smith testified that Hubbard was unaware of Plaintiff's EEO complaint and that they never discussed the complaint with each other.[17] *See* ECF No 60-6, ¶ 15; ECF No. 60-1 at 801 (Hubbard averring that "[n]o one informed me of any EEO actions"); ECF No. 60-4 at 136 (Hubbard testifying that Smith never told her that Harris had filed a discrimination complaint); ECF No. 60-5 at 155–56 (Smith testifying that she never told Hubbard of Harris' EEO complaint). For her part, it is undisputed that Plaintiff never discussed her EEO complaint with Hubbard nor did she inform Hubbard when she

---

[17] Hubbard averred that she did not learn of Plaintiff's EEO complaint until she was interviewed by the EEO investigator in January 2021. ECF No. 60-6, ¶ 16.

expanded her EEO complaint in September 2020 to include claims against Hubbard.  *See* ECF No 60-6, ¶¶ 13–14; ECF 60-2 at 147 (Harris confirming in her deposition that she "never told [Hubbard] about [her] EEO complaint").  Nor did she ever witness Hubbard and Smith discussing the complaint.  *See* ECF No. 60-2 at 99 (Harris testifying that she never witnessed Hubbard and Smith discussing her EEO complaint); *id.* at 148 (Harris testifying that she never witnessed Smith tell Hubbard that she had submitted an EEO complaint).

Although at the summary judgment stage a plaintiff "need only offer circumstantial evidence that could reasonably support an inference" that the decision-maker knew of the protected EEO activity, *Talavera*, 638 F.3d at 313 (quoting *Jones*, 557 F.3d at 679), and "context matters," *id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 69 (2006)), Harris has offered only speculative arguments as to Hubbard's' knowledge of her EEO activity.  Harris' position is like that of the plaintiff in *Talavera* who the D.C. Circuit concluded "offered only evidence from which a reasonable jury would have . . . to speculate that [the decision maker] knew [of the protected EEO activity]," which the Court found "insufficient to defeat summary judgment."  *Talavera*, 638 F.3d at 313.  In *Talavera*, the plaintiff attempted to establish an inference of knowledge by pointing to the close temporal proximity between her EEO activity and the non-promotion at issue—there, a period of only a month—as well as evidence that her supervisor was close friends with managers that knew of her EEO activity.  *Id.*  The Court found the showing insufficient, noting that, like Hubbard here, the supervisor had testified during his deposition that he did not know of the plaintiff's EEO activity.  *Id.*  On that record, the Court ruled that the plaintiff was "required" to produce "positive evidence beyond mere proximity . . . to defeat the presumption that [the supervisor's] proffered explanations are genuine.'"  *Id.* (quoting *Woodruff*, 481 F.3d at 530).  The plaintiff's evidence that the supervisor "worked closely" with other managers that knew

of her EEO activity and that they "discuss[ed] personnel matters . . . on a regular basis and they hung out together," was deemed inadequate to that task as it would still require a jury "to speculate that [the supervisor] knew" of the plaintiff's protected activity. *Id.*

The facts presented here are similar and point to the same conclusion. In the face of Hubbard's and Smith's denials under oath that Hubbard knew of Harris' EEO activity, alongside Plaintiff's own testimony that she never informed Hubbard of it, Plaintiff must produce "positive evidence beyond mere proximity . . . to defeat the presumption that the proffered explanations are genuine." *Id.* Plaintiff has not met that burden. She has offered no evidence, for example, of meetings between Hubbard and the EEO office following the filing of her EEO complaint, or of a policy or practice of such communications when an EEO complaint is filed. Nor has she even offered what was found deficient in *Talavera*: evidence of a relationship between Hubbard and other managers who knew of her EEO activity, and evidence that personnel actions were routinely discussed by them. *See id.*

Attempting to overcome this defect, Plaintiff asserts in her opposition that record evidence demonstrates "Hubbard's involvement in discussions about the plaintiff's EEO complaint" in September 2020 when Hubbard indicated her intention to place Harris on a PIP and her warning that if "[Harris] did not sign it, things would get worse." ECF No. 60 at 4. However, the citations to the record that Plaintiff provides do not support this assertion and wholly fail to satisfy Plaintiff's burden to survive summary judgment.[18] *Id.* The Court will not root through the over 2000 pages of records Plaintiff appended to her opposition to find factual support to fill in this gap. *Jones,*

---

[18] Plaintiff cites page 4 of her declaration submitted as part of the Report of Investigation. *Id.* That page describes Harris' work and her working relationship with Hubbard; it makes no mention of Hubbard's alleged "involvement in discussions about plaintiff's EEO complaint." *Compare.* ECF No. 60 at 4 (arguing Defendant's assertion that Hubbard was unaware of the EEO activity is contradicted by evidence in the record) *with* ECF No. 60-1 at 213 (Harris describing her work responsibilities and relationship with Hubbard).

835 F.3d at 83 ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." (quoting *Estate of Parsons*, 651 F.3d at 137)); *see also Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999) (conclusory assertions offered without evidentiary support do not establish a genuine issue for trial).

Also unconvincing is Plaintiff's suggestion that she need not prove Hubbard's knowledge of her protected EEO activity but can instead survive summary judgment by proving "awareness of her EEO complaint" generally within "FEMA's leadership," apparently through application of "principles of organizational knowledge." ECF No. 60 at 11, 36. Again, Plaintiff cites nothing from the record that supports her factual assertion that "FEMA's leadership['s]" knowledge of her EEO activities "influenced her treatment, directly or indirectly." *Id.* at 11. The single record citation she provides makes no mention of her EEO activity or the knowledge of it by "FEMA's leadership."[19] *See id.* Again, this fails to carry Plaintiff's burden to identify evidence in the record supporting the existence of a genuine dispute of fact. *See Jones*, 835 F.3d at 83. More, Plaintiff fails to identify any legal authority for her assertion that "organizational knowledge" suffices to overcome a decisionmaker's testimony under oath that she did not know of the plaintiff's protected activity when she took the adverse employment actions at issue. The one case Plaintiff does cite— *Veer v. Shinseki*—does not appear to exist. *See* ECF No. 60 at 34.[20] In any event, courts in this

---

[19] Plaintiff cites page 8 of her declaration submitted as part of the Report of Investigation. ECF No. 60 at 11. That page describes Harris' work preparing tables and slide decks. *Compare id.* (arguing the office environment and communication between FEMA's leadership indicates Hubbard was aware of Harris' EEO activities) *with* ECF No. 60-1 at 217 (discussing Harris' work responsibilities, whether witnesses existed to Hubbard asking Harris to work on days off, and whether Harris spoke with Hubbard about her "negative attitude and criticism").

[20] Plaintiff provides the citation for that case as follows: *Veer v. Shinseki,* 607 F.3d 1086 (D.C. Cir. 2010). ECF No. 60 at 34. The case located at that citation is *Bennett v. MIS Corp.,* 607 F.3d 1076 (6th Cir. 2010), a medical malpractice lawsuit that has nothing to do with "organizational knowledge." Neither the government nor the Court could locate *Veer v. Shinseki* by searching on Westlaw by party name "Veer," either within the D.C. Circuit or within all federal case law. *See* ECF No. 61 at 16, n. 2**.**

District have affirmed, in the Title VII context, that evidence that one official within the defendant's organization received notice of protected EEO activity, without more, does not support a reasonable inference that other officials also had notice of that activity. *See Hazward v. Runyon,* 14 F. Supp. 2d 120, 124 n.9 (D.D.C. 1998) ("The bald fact that someone in a supervisory capacity over the plaintiff knew of the filing is insufficient to lead to a reasonable conclusion that others would also know, unless the plaintiff adduced evidence that this was the sort of information of which intermediate supervisors were required to inform their managers."); *see also Pollard v. Quest Diagnostics,* 610 F. Supp. 2d 1, 32 (D.D.C. 2009) (same).

Because Plaintiff has failed to meet her burden of proof to demonstrate some connection between Hubbard's knowledge of her EEO activity and the adverse actions Hubbard took, summary judgment will be granted in Defendants' favor.

> 2.    Plaintiff's other evidence of pretext and retaliation is also insufficient to deny summary judgment.

Setting aside the deficiencies in Plaintiff's showing concerning Hubbard's knowledge of her EEO activity and widening the aperture to consider her other evidence of pretext and retaliation, the Court reaches the same conclusion.  In addition to evidence of temporal proximity, to support an ultimate inference of retaliation, Harris points to comparator evidence, to her belief that her job performance was satisfactory, to inconsistencies between Hubbard's assessment of her job performance and prior job evaluations, and to inconsistencies between Defendants' actions and FEMA policies.  *See* ECF No. 60 at 24.  For the following reasons, even were the Court to ignore the deficiencies in Plaintiff's evidence concerning Hubbard's knowledge of her EEO activity, she has not pointed to facts in the record, or fair inferences therefrom, that are sufficient to lead a reasonable factfinder to rule in her favor on the ultimate issue of a retaliatory motive for any of the adverse employment actions at issue.

In evaluating Plaintiff's evidence of pretext and retaliatory motive, the Court will first address the absence of any valid comparators as this deficiency is applicable to all the remaining adverse actions. It will then assess Plaintiff's other evidence of pretext and a retaliatory motive, taking first as a group the three performance-based adverse actions—Hubbard's reassignment of Harris' duties, her curtailing of Harris' communications with her co-workers, and her indicating her intention to place her on a PIP and warning her that if "she did not sign it, things would get worse." The analysis will then conclude with an assessment of Plaintiff's evidence of pretext and a retaliatory motive with respect to the final two adverse employment actions—Hubbard allegedly requiring Harris to work during lunch breaks and scheduled time off and denying Harris' requests for annual leave.

>    a.    *Plaintiff has not identified similarly situated comparators treated more favorably than her.*

To establish a retaliatory motive, a plaintiff may rely on evidence that their supervisor treated similarly situated employees who did not engage in protected EEO activity more favorably than the plaintiff to support an inference that the employer's stated explanation was pretextual and the real reason was retaliation. *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015); *cf. Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296–97 (D.C. Cir. 2015) ("Evidence suggesting that the employer treated similarly situated persons who were not the same race as the plaintiff more favorably than it treated the plaintiff can [] be probative of discrimination."). To establish that a plaintiff is similarly situated to another employee, the plaintiff "must demonstrate that [s]he and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness." *Burley*, 801 F.3d at 301 (citing *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)). The plaintiff "must also demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the [other]' employee." *Id.* (second alteration in original) (quoting

*Holbrook*, 195 F.3d at 261). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012)). Although the D.C. Circuit has stated that the question of "whether two employees are similarly situated is ordinarily a question of fact for the jury," to survive summary judgment, a plaintiff must present sufficient comparator evidence "from which a jury could reasonably conclude . . . that one or more of the proposed comparator[s] . . . were similarly situated to [the plaintiff] in all relevant respects." *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016). Plaintiff fails to do so here.[21]

She identifies three comparators that she contends were treated more favorably than her— S.C., L.C., and K.H.[22] *See* ECF No. 60 at 39. The Court is unpersuaded. As an initial matter,

---

[21] In articulating the legal standard for a court's evaluation of comparator evidence, Plaintiff again mis-cites purported caselaw. In her opposition, she gives the legal citation for *Morrison v. Amtrak* as 822 F.3d 489, 494 (D.C. Cir. 2016). ECF No. 60 at 39. *Morrison v. Amtrak* is not located at that citation. Rather, there you will find *Rishor v. Ferguson*, a Ninth Circuit case involving a petition for writ of habeas corpus. *See* 822 F.3d 482 (9th Cir. 2016). Given the commonness of the names "Morrison" and "Amtrak," the Court did not search for whatever case Plaintiff was attempting to rely on. It is not the Court's obligation to do so.

[22] Although comparators are regularly named in publicly available opinions, when an opinion discusses a comparator's performance records or disciplinary decisions taken against them, courts at times will redact the comparators' names to protect the privacy interests of the non-parties, particularly when the non-parties' names are irrelevant to the disposition of the case. *Cf. Breiterman v. U.S. Capitol Police*, No. 19-cv-893, 2019 WL 11318341, at *2 (D.D.C. Sept. 20, 2019) (finding that the balance between public access to court documents and privacy interest of non-parties permitted comparator names to be redacted in public documents containing details of the comparators' employment disciplinary records); *Thomas v. Delmarva Power & Light Co.*, No. 15-cv-433, 2016 WL 9685173, at *3 (D. Md. Dec. 12, 20because16) (substituting non-party employee names with "their own initials" or "where appropriate, pseudonymous initials" "the identities of the non-party employees are not important to the disposition of this case"); *Laudig v. IBM Corp.*, No. 21-cv-5033, 2022 WL 182322706, at *9 (N.D. Ga. Dec. 16, 2022) (finding good cause to redact the names of nonparty employees and noting that minimal redactions "make[] sense" when "comparators, their names[,] and titles are not particularly relevant to the issue presented"). Here, the Court chooses to refer to Harris' named comparators by their initials to maintain a level of privacy for these non-parties and because it finds that the names are not important to the disposition of this case. *See Thomas*, 2016 WL 9685173, at *3. The names of the non-parties are certainly irrelevant to the disposition of a case when a court finds, as it does here, that the non-party employees are not legally sufficient comparators. Yet, the Court must discuss each of the comparators' employment history in some detail to come to this conclusion.

Plaintiff's argument in support of their legal sufficiency as comparators is deficient on its face. It takes up just two pages in her 43-page opposition and says very little. ECF No. 60 at 39–40. Her citation to caselaw is threadbare, her legal arguments are entirely conclusory, and she makes no attempt to analyze the factual record. *Id.* Indeed, the only record citation she includes is to a few lines from her deposition wherein she merely confirms the names of her comparators. ECF No. 60 at 39 (citing page 200 of Plaintiff's deposition, lines 2–15, *see* ECF No. 60-2 at 200). She does not meaningfully grapple in her opposition with the government's arguments demonstrating that none of them are proper comparators based on her own testimony, or the facts she has admitted that makes their comparison untenable. Stated simply, there is no evidence there. The Court will not make Plaintiff's argument for her or root through the record searching for facts to support it. *Jones,* 835 F.3d at 83 ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." (quoting *Estate of Parsons,* 651 F.3d at 137)); *see also Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999) (conclusory assertions offered without evidentiary support do not establish a genuine issue for trial).

Setting those facial deficiencies to the side, what little the Court can discern in support of Plaintiff's argument is insufficient. She does not state whether and how each identified comparator applies to each of the five adverse employment actions at issue. Rather, she asserts more generally that they did not engage in EEO activities, that they experienced some kind of performance issue, but that they were not treated adversely like her. *See* ECF No. 60 at 39–40. Plaintiff asserts—again without citation to the record—that they are "relevant for comparison" because they "shared similar job responsibilities and were under the same supervisory structure" as she was. *Id.* at 39. Even if true, however, that is insufficient to satisfy her burden at this stage. Again, in cases

involving discipline, a plaintiff must also establish a sufficient factual basis for a reasonable jury to find that the comparator employee was "charged with offenses of comparable seriousness." *Burley*, 801 F.3d at 301 (citing *Holbrook*, 196 F.3d at 261). Plaintiff has not done so. Indeed, in her opposition, she admits that none of the comparators were "reprimanded for the same issues" that she was. ECF No. 60 at 39. Similarly, in her response to the government's statement of material facts, she acknowledges that she was "unaware of instances of these putative comparators ever being reprimanded for submitting untimely work" like she was. ECF No. 60-6, ¶ 32. She further admits that she lacks knowledge of meetings between Hubbard and K.H. regarding poor work performance more generally. *Id.,* ¶ 33. Indeed, the evidence in the record does not indicate that K.H. had any performance issues, let alone any issues of "comparable seriousness" as did Plaintiff.[23]

As for S.C. and L.C, while Plaintiff asserts that Hubbard had meetings with them regarding their performance—just as Hubbard did with her—she admits that they *improved* their performance in response to Hubbard's counseling. *See id.,* ¶ 34. It is undisputed that Plaintiff did not do so. Indeed, Plaintiff admits that by September 18, 2020—after a summer of interaction and counseling by Hubbard—she "had failed to complete the majority of her assignments that she needed to by the close of the fiscal year." *Id.*, ¶ 17; *see also id.*, ¶ 26 (Plaintiff admitting that "Hubbard reassigned Plaintiff's duties . . . due to Plaintiff's failure to complete the projects in a timely manner and due to work performance that Ms. Hubbard viewed as unsatisfactory"). Accordingly, Plaintiff has not met her burden of identifying a triable issue as to whether the three individuals she has identified experienced performance issues of "comparable seriousness" and

---

[23] Harris testified in her deposition that she did not know K.H's performance ratings for the relevant period. ECF No. 60-2 at 214. Nor did she know whether K.H. was ever reprimanded for untimely work or poor work performance. *Id.* at 214–15. Instead, she noted K.H. "was always praised in public so I would assume that she did not [get reprimanded]." *Id.*

were treated differently than her.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587 ("[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" (quoting former Fed. R. Civ. P. 56(e) (emphasis in original)).

More, it is uncontested that S.C. worked in budget formulation, not budget execution like Plaintiff.  ECF No. 60-2 at 92; *see also id.* at 201 (Plaintiff acknowledging that she did not know what S.C.'s duties were during the relevant time but that she was generally involved in budget formulation).  Plaintiff herself testified in her deposition that budget formulation was different than budget execution in terms of the roles, workload, and, most critically here, deadlines.  *Id.* at 92–93.  Indeed, Plaintiff testified with respect to S.C. that "[o]ur roles were just completely different.  My role was busy all the time."  *Id.* at 93.  L.C's job responsibilities were even further afield from Plaintiff's.  According to Harris, while she did not know L.C.'s specific job title, L.C. worked in human relations—referred to as "human capital"—between June and September 2020.  *Id.* at 206.  Plaintiff testified that L.C. "dealt with packages . . . that were hiring in nature.  She dealt with components to help them make sure that their . . . employees were proper or right."  *Id.* at 207.  That vague description of L.C.'s job duties does not satisfy Plaintiff's burden of presenting evidence from which a reasonable jury could find that L.C's job was similar to her own as a Program Analyst.  Indeed, Plaintiff admitted in her deposition that she "did not do [L.C.'s] work."  *Id.* at 209.  Accordingly, for the additional reason that the uncontested record evidence establishes that L.C. and S.C. had different roles and responsibilities than Plaintiff,[24] a factfinder could not reasonably find that they were similarly situated to her in all material respects.  *See, e.g.*, *Burley*, 801

---

[24] There may be sufficient record evidence for a reasonable jury to find that K.H. was similarly situated to Harris with respect to her job duties in that both were "Analysts" working for Hubbard with budget execution duties during the relevant time.  *See* ECF No. 60-2 at 212–14; ECF No. 55-2, ¶ 2; ECF No. 60-4 at 98, 132.  Even so, and as stated above, the comparison between K.H. and Harris fails because Plaintiff has not met her burden of presenting evidence from which a reasonable jury could find that K.H. had performance issues of "comparable seriousness" as did Harris.  Again, Plaintiff has presented no evidence that K.H. had performance issues whatsoever.

F.3d at 301–02 (affirming summary judgment for employer because comparator evidence was insufficient "[g]iven the undisputed evidence of their distinct roles and the different nature of their violations").

For these reasons, the Court finds that Harris has not identified appropriate comparators in support of her retaliation claim.

> b.    *Plaintiff's evidence is insufficient for a reasonable jury to find pretext or a retaliatory motive with respect to the three performance-based adverse actions.*

The Court next considers the sufficiency of Plaintiff's other evidence of pretext and retaliatory motivation with respect to the three adverse actions that were performance-based—namely, Hubbard's reassignment of Harris duties, her curtailing of Harris' communications with her co-workers, and her indicating her intention to place Harris on a PIP and warning her that if "she did not sign it, things would get worse."

As stated previously, for each of these actions, Defendants offer the same explanation: Hubbard's belief that Harris' work performance was subpar and was not improving despite counseling. *See, e.g.*, ECF No. 60-4 at 28–29 (Hubbard testifying that she reassigned Harris' job duties due to performance issues and stating that she had "constantly gone back and forth with Ms. Harris . . . to try to . . . give her more clarification . . . and it just wasn't happening. . . . [S]o that's when [she] asked another employee to step in and to kind of help in getting the task completed so that we can meet our deadline."); *id.* at 89 (Hubbard testifying that because deadlines were not being met, she told Harris that she "probably doesn't need to bother coming to the community of practice meetings.  Just focus on getting these projects done."); *id.* at 126 (Hubbard testifying that the "PIP came into play" after she had "advised Ms. Harris of her performance" and stressed the need to "improve [her] performance" but "felt like it was falling on deaf ears").  Not surprisingly,

Plaintiff's showing as to pretext and retaliatory motivation for these three adverse actions is also substantially the same. Accordingly, they will be considered together.

Understandably, Plaintiff's argument begins where most such arguments do: by asserting that her job performance for Hubbard was not subpar. According to Harris, she has "detailed accounts of her [positive] work performance, including instances where she met or exceeded expectations." ECF No. 60 at 26; *see also id.* at 18 (Harris arguing that, although Hubbard cited ongoing performance concerns as the reason for initiating the PIP, Harris "did not agree with the assessment"); ECF No. 60-6, ¶ 43 ("The [PIP], presented to Ms. Harris, was based on subjective and unfounded criticisms, emerging after the EEO complaint."). Plaintiff's subjective belief that she was performing satisfactorily during the time in question does not tip the balance in her favor, however. It is established in this Circuit that an employee's subjective assessment of her own job performance does little to elucidate whether her supervisor reasonably believed that the employee's performance was insufficient or otherwise subpar. *See, e.g.*, *Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("In light of the record evidence, Vatel's mere personal opinion that she and McCurdy had a positive working relationship is insufficient to surmount summary judgment."); *Walker*, 798 F.3d at 1094 (noting that the plaintiff "points to nothing other than her own opinion of her performance to dispute [her employer's] evaluation," and finding that her "own personal opinion is inadequate by itself to create an issue for the jury"); *Congress v. Greenberg*, 643 F. Supp. 3d 203, 236 (D.D.C. 2022) ("[A]n employee's personal opinion as to an employer's assessment of [her] does not matter."). Indeed, the issue is not whether the employee's performance was *actually* subpar, but whether the supervisor "honestly and reasonably believed" it was. *See Vatel*, 627 F.3d at 1247–48. And, as to that question, "[i]t is settled that 'it is the

44

perception of the decisionmaker which is relevant, not the self-assessment of the plaintiff.'" *Id.* at

1247 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).[25]

Also off the mark is Harris' attempt to attribute blame for her perceived poor performance

to Hubbard's "challenging" and "direct" supervisory style. ECF No. 60 at 9. Harris contends that

she and her colleagues were able "to thrive" before Hubbard became their supervisor and "that the

lack of clear guidance and shifting expectations under [Hubbard's] leadership contributed to any

perceived deficiencies in her work." *Id.* at 6, 10; *see also id.* at 16 (arguing "Hubbard did not

always provide a clear rationale for reassigning work"). From Harris' perspective, Hubbard's

reviews of her performance "were not adequately supportive or constructive [and] fail[ed] to ac-

count for her years of experience and previous performance levels." *Id.* at 11. Or, in a variation

on that theme, she stresses that "Hubbard's observations [of Plaintiff's performance]

lack[ed] . . . comprehensive evaluation of Harris's capabilities and contributions" and that Hub-

bard's "changes [after she took over as supervisor] were implemented without consultation with

existing staff, including Harris, potentially undermining their effectiveness and contributing to

misunderstandings about performance expectations." *Id.* at 10. But as other courts have held, an

employee's "own disagreement" with a supervisor's management decisions and style is of no

---

[25] Similarly, Harris' reliance on the testimony of other employees who may attest to her "dedication, competence" and meticulous approach to her work," her "value to the team," the "high regard in which she was held by her colleagues," *see* ECF No. 60-6, ¶¶ 69–76, is not probative of whether Hubbard honestly and reasonably believed Harris' perfor-mance was subpar. *See, e.g.*, *Khan v. Holder*, 37 F. Supp. 3d 213, 227 (D.D.C. 2014) (finding that employees' opinions of the plaintiff's positive work performance were irrelevant to contest the supervisor's negative opinion of the plain-tiff's work performance—"[t]he opinions of others . . . would only be relevant if they showed that [the supervisor] was lying and did not reasonably believe his assessment of [the] plaintiff's work" (citing *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 115 (D.D.C. 2004)); *He Yan v. Univ. of N.C. at Greensboro*, No. 4-cv-155, 2005 WL 8166708, at *6 (M.D.N.C. Sept. 15, 2005) (finding co-worker perception of the plaintiff's performance "insufficient to establish that an employee is meeting her employer's expectations" (citing *King v. Rumsfeld*, 328 F.3d 145, 150 (4th Cir. 2003) ("[C]o-workers' fact testimony cannot build a prima facie case . . .")). Moreover, many of the declarations address adverse actions that are no longer at issue. *See* ECF No. 60-6, ¶¶ 69-76; *see, e.g.*, ECF No. 60-1 at 892 (co-worker averring as to why he believed Harris was not hired to a management position in April2020); *id.* at 910 (co-worker speaking about Harris' complaint that she was subjected to race, sex, and age discrimination when he was required to "perform[] higher-level work without appropriate compensation"); *id.* at 936 (co-worker discussing Harris' complaint that she was subjected to discrimination when Hubbard stated she "does not do 'analysis'").

moment and "certainly not sufficient to establish pretext." *Ey v. Off. of Chief Admin. Officer of House of Reps.*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013); *see also Pereira v. Gruenberg*, No. 20-cv-3836, 2024 WL 450241, at *4 (D.D.C. Feb. 6, 2024) (noting that the plaintiff's "subjective disagreement with his supervisor is of no moment"). In this case, such arguments lead to a conclusion that is both unhelpful to Harris' cause and not significantly inconsistent with the explanation Hubbard offers for the actions she took: that Harris was not performing her job well, albeit perhaps because Hubbard was a poor supervisor. Even if the latter were true, it would not provide a reasonable basis to conclude that Hubbard did not honestly believe that Harris was not performing her job well, much less to infer that she retaliated against Harris when she took the actions that she did. At best, it would point to a different, non-retaliatory reason for the reassignment of Harris' duties—that Hubbard was herself a poor supervisor causing her employees to perform poorly. Even so, that would not be inconsistent with Hubbard's own belief that Harris was performing poorly.

And, on the issue of Plaintiff's job performance, it is Hubbard's perspective that matters. Again, "[o]nce the employer has articulated a non-[retaliatory] explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (fourth through sixth alterations in original) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). An "employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision. If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 288. Here, the evidence that

Harris offers to show that her performance issues were "made up" by Hubbard is scant.  Plaintiff does not dispute that she missed deadlines after Hubbard became her supervisor on or around May 2020; she admits that "Hubbard reassigned [her] duties . . . due to [her] failure to complete the projects in a timely manner and due to work performance that Ms. Hubbard viewed as unsatisfactory." *Id.*, ¶¶ 12, 26.  Indeed, she admits that, by September 18, 2020, she "had failed to complete the majority of her assignments that she needed to by the close of the fiscal year." *Id.*, ¶ 17.  Where a plaintiff "[does] not contravene—and in fact admit[s]—many of the deficiencies the defendants cited concerning her performance, she fail[s] to establish" pretext. *Waterhouse*, 298 F.3d at 995; *see also id.* at 994 (plaintiff did not establish pretext where she "admitted that she missed the deadlines" and "[h]er only defense was that . . . she should have received greater support from outside contractors"); *McGrath v. Clinton*, 666 F.3d 1377, 1384–85 (D.C. Cir. 2012) (finding that where plaintiff did not dispute that he "failed to heed" instruction given to him, "failed to perform his assigned tasks," "offer[ed] explanations for [only] some of his actions," and  noted that "he made useful contributions on specific programs," those "responses offer[ed] no grounds for a rational juror to conclude" that he was fired in retaliation for protected activity rather than for poor performance " (quoting *Waterhouse*, 298 F.3d at 995 )).

More, Harris' suggestions to the contrary notwithstanding, the undisputed record reflects that the reasons for Hubbard's actions were no mystery to her.[26]  Harris confirmed in her deposition that Hubbard repeatedly told her that she was performing poorly and that the actions Hubbard was taking were because of Harris' subpar work performance and because she failed to complete her projects on time.  ECF No. 60-2 at 97 (Harris testifying that Hubbard reassigned some of her

---

[26] Similarly, although Harris asserts that Hubbard did not always provide a clear rationale for reassigning work, *see* ECF No. 60 at 16, she testified that "if she did provide an explanation, it was that . . . she viewed [Harris'] performance as unsatisfactory," ECF No. 60-2 at 132.

duties to another employee because she "needed to give [the other employee] something to do" and because Hubbard thought Harris "couldn't do anything right, that [Harris] didn't know what [she] was doing"); *id.* at 72–74 (Harris testifying that Hubbard told her not to attend meetings because "[Harris] needed to work on her performance"); *id.* at 98 (Harris testifying that, on another occasion, Hubbard told her she reassigned Harris' duties because Harris "need[ed] to work on [her] performance"); *id.* at 131 (Harris testifying that, on another occasion, Hubbard told her she was reassigning one of her duties "because you are not performing"); *id.* at 126 (Harris testifying that "no less than once a week" between June and September 2020 "Hubbard would make derogatory remarks about [her] work performance" in group settings); *id.* at 145 (Harris testifying that Hubbard discussed her performance with her in one-on-one conversations and confirming that Hubbard had "issues" with her performance); *id.* at 174 ("Ms. Hubbard basically started the meeting with saying that she . . . was not happy with my performance and that she is going to be . . . putting me on a Performance Improvement Plan.")).  Given that record, a reasonable jury could not find that Hubbard's stated reason for the three adverse actions at issue—Plaintiff's poor job performance—was a sham, and that the real reason was retaliation for her EEO activity—especially given that Hubbard has denied under oath that she even knew of that EEO activity at the time.  *See* ECF No. 60-4 at 136; ECF No. 60-1 at 801.

Nevertheless, the Court has considered the other arguments that Harris has made challenging Hubbard's explanation that she took these three adverse actions because of Harris' poor job performance.  Her arguments in favor of pretext and a retaliatory motive for those actions boil down principally to two things: first, Plaintiff points to the proximity between Hubbard's negative assessment of her job performance in the summer of 2020 and the EEO complaint she filed on June 16, 2020, *see* ECF No. 60 at 15 (noting the "proximity of [the reassignment of Harris' work

duties] to Harris' prior EEO complaint"); *id.* at 17 (noting the "timing of [the] restrictions [on Harris' communications with her co-workers], following Harris' EEO complaint"); *id.* at 32 ("[T]he timing relative to Harris's EEO activities suggest that the PIP was not a genuine attempt to address performance issues but rather a retaliatory action."); second, she points to positive performance reviews and commendations she received from supervisors prior to Hubbard and prior to her filing the EEO complaint, *see id.* at 4 (arguing that Plaintiff can rebut Defendants' explanation of perceived performance issues because she has a "documented history of commendations prior to the EEO complaint").[27]  The Court is unpersuaded.  Even when considered together, this showing does not sufficiently create any triable issue related to the three performance-based adverse employment actions.

To begin, recall that temporal proximity is insufficient to infer pretext at the summary judgment stage.  After "an employer has put forth legitimate, non-retaliatory reasons for a

---

[27] Plaintiff also argues that Hubbard's failure to bring the PIP paperwork to the August 31, 2020, meeting—when she first discussed with Harris placing her on a PIP—"raises significant concerns about the pretextual use of performance evaluations as a retaliatory measure." ECF No. 60 at 32.  Plaintiff's point is hard to discern.  Hubbard's alleged failure to bring PIP paperwork to the meeting would tend to show that she did not believe that a PIP was a *fait accompli*, a point which Harris herself acknowledges.  *See id.* at 18 (Harris arguing that because "Hubbard did not have the PIP paperwork ready" at the meeting, it "indicat[ed] a lack of . . . immediate intent to enforce the PIP at that time").  But perhaps Plaintiff means to suggest that Hubbard could not have honestly believed Harris was underperforming if she did not bring the PIP paperwork to the meeting.  That runs counter, however, to the overwhelming evidence in the record that Hubbard was, by August 31, 2020, dissatisfied with Harris' performance, and had repeatedly told Harris so.  *See, e.g.*, ECF No. 60 at 18 (Harris admitting that "[d]uring Harris's mid-year evaluation, she advised that Harris was not meeting her performance plan and needed to improve"); ECF No. 60-4 at 126 (Hubbard testifying that she had told Harris numerous times she needed to improve her performance but "felt like it was falling on deaf ears").  The material—and undisputed—point is that Hubbard stated at the meeting that she was dissatisfied with Harris' job performance and was going to put her on a PIP.  *See* ECF No. 60-2 at 174 (Harris testifying that Hubbard started the meeting by saying she was unhappy with Harris' performance and was going to put her on a PIP).  Whether Hubbard brought the paperwork to do so at that very moment is beside the point.

Also unavailing is Plaintiff's assertion that Hubbard's statement during the meeting that if Harris "did not sign [the PIP], things would get worse" was a "clear instance of . . . retaliation."  ECF No. 60 at 36; ECF No. 60-6, ¶ 29; *see also id.*, ¶ 76.  The statement is neither clear nor clearly retaliatory.  Plaintiff testified that Hubbard did not say at the meeting what the "worse consequences" would be; rather, Harris assumed she meant "termination."  ECF No. 60-2 at 175, 177–78.  More, Harris testified that, despite the statement, she still believed she had the option not to sign the PIP, and she did not do so when it was presented.  *Id.* at 176 (Harris testifying that she "[believe[d] [she] had the option" not to sign the PIP and "didn't sign it because [she] did not agree with it").  And Plaintiff provides no evidence of any consequence arising from her refusal.  Such a vague and bare assertion of a threat which is "ultimately unconsummated" is not sufficiently adverse to support a retaliation claim.  *McNair v. District of Columbia*, 903 F. Supp. 2d 71, 75–76 (D.D.C. 2012); *Lawrence v. Lew*, 156 F. Supp. 3d 149, 165 (D.D.C. 2016).

challenged action, 'positive evidence *beyond mere proximity* is required to defeat the presumption that the proffered explanations are genuine.'" *Allen*, 795 F.3d at 47 (emphasis added) (quoting *Hamilton*, 666 F.3d at 1359; *see also Talavera*, 638 F.3d at 313 ("Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, 'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.'" (citation omitted) (quoting *Woodruff*, 482 F.3d at 530)).  Harris' reliance on her past performance evaluations and commendations that she received prior to her EEO complaint fares no better. Courts in this district have explained that "[a]n employer's description of an employee's performance as unsatisfactory will not be deemed pretextual just because the employee was a good performer at an earlier time." *Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *27 (D.D.C. Oct. 27, 2022) (quoting *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 163 (D.D.C. 2011)), *aff'd*, No. 22-5310, 2024 WL 3219489 (D.C. Cir. 2024).  "Evaluations may change over time due to a variety of reasons . . . . This is a reality of the workplace and, consequently, a more negative evaluation compared to a prior evaluation is simply not sufficient, standing alone, to establish[] retaliation or pretext." *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 162 (D.D.C. 2013); *see also Ramseur v. Perez*, 80 F. Supp. 3d 58, 73-74 (D.D.C. 2015) ("Plaintiff's receipt of better appraisals in the past does not suggest that her [] rating was a pretext," and "it is well established that a drop in performance rating does not, without more, give rise to an inference of discrimination").  More, Hubbard was not Harris' supervisor when the more positive performance reviews and commendations she relies on occurred.  *See* ECF No. 60-1 at 96–131, 144–146, 271–276, 320; *see also* ECF No. 60-4 at 14–15 (Hubbard testifying she began working for FEMA in May 2020).  Different supervisors evaluating an employee differently over time provides an even less colorable basis to infer pretext at the summary judgment stage.  *See Craig v. Mnuchin*, 278 F. Supp. 3d 42, 59

(D.D.C. 2017)("[C]ourts in this Circuit have routinely refused to infer discriminatory pretext merely because a subsequent supervisor departs from a prior supervisor's appraisal."); *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 193 (D.D.C. 2011) ("[E]vidence of the plaintiff's higher performance ratings by evaluators other than [plaintiff's current supervisors] is insufficient to give rise to an inference of race or gender discrimination."); *Hassain v. Principi*, 344 F. Supp. 2d 86, 102 n.19 (D.D.C. 2004) ("[T]he fact that a previous manager found that plaintiff had met or exceeded expectations does not, by itself, establish that a subsequent manager's evaluation of employee's performance was discriminatory.").

Indeed, Harris' *own* explanation for the difference between her work performance before and after Hubbard became her supervisor is self-defeating; she contends that her "consistent performance prior to this period suggests that the identified 'issues' [with her performance under Hubbard] may have been more reflective of . . . *transitional instability* rather than her professional capabilities." ECF No. 60 at 7 (emphasis added); *see also id.*("[I]t's crucial to underscore that this period of transition could inherently contribute to misunderstandings or miscommunications regarding performance expectations."); *id.* at 9 ("While [Hubbard's 'direct and clear' supervisory style] might be generally positive, it overlooks the adjustment period and potential misalignment with existing staff's working styles, including [Plaintiff's].").  Even if true, the "transitional instability" and "adjustment period" that may have occurred when Hubbard first became Harris' supervisor provides an explanation for her treatment that is not retaliatory, and is, in fact, consistent with Hubbard's belief that Harris performed poorly during that period.

Accordingly, summary judgment will be granted with respect to the three performance-based adverse actions—i.e., Hubbard's reassignment of Harris duties to another employee, her

curtailing of Harris' communications with her co-workers, and her indicating her intention to place

Harris on a PIP and warning her that if "she did not sign it, things would get worse."

> c. *Plaintiff's evidence is insufficient for a reasonable jury to find pre-*
> *text or a retaliatory motive when Hubbard denied her annual leave*
> *requests.*

Harris argues that Hubbard's "pattern of denial of [her annual] leave requests immediately

following [her] EEO complaint" deviated from "previous practice of granting such requests, with-

out a clear and legitimate explanation." ECF No. 60 at 3. It is true that "a plaintiff may attempt

to cast doubt on an employer's asserted reasons by offering evidence of 'the employer's failure to

follow established procedures or criteria.'" *Felder v. Johanns*, 595 F. Supp. 2d 46, 74 (D.D.C.

2009) (quoting *Brady*, 520 F.3d at 495 n.3)). But here, Harris acknowledges that the practice

requiring pre-approval of annual leave was in place before Hubbard began working for FEMA.

*See* ECF No. 60 at 14 ("Harris acknowledges that a pre-approval requirement for leave was in

place before Ms. Hubbard's tenure at FEMA."); ECF No. 60-6, ¶ 21 (admitting the "need to seek

pre-approval for leave had been in place prior to Ms. Hubbard starting at FEMA"); ECF No. 60-1

at 212 (Harris noting that Hubbard "stated that [Harris] must inform [Hubbard] ahead of time when

[she] would be off work" but that Harris "always obtain[ed] approval for time off")). Further,

there is undisputed evidence that after Hubbard came onboard as the new Director of Resource

Management, she instituted a policy in July 2020 that annual leave requests over the next few

months would be denied because the end of the fiscal year was fast approaching and assignments

needed to be completed. *See* ECF No. 60-4 at 66–68. It was Hubbard's "school of thought" that

because of "the requirements that were going to be needed to close out [the] fourth quarter, it was

in the best interest that we all be online and processing," not taking leave. *Id*. at 68. Hubbard

testified that this policy was applicable not only to Harris, but to Hubbard's "entire staff," including

herself. *See id.* at 66–67 ("[O]nce I arrived at FEMA, there were a lot of assignments . . . [and] [r]ealizing that annual leave had been put in not only by Ms. Harris, but by my entire staff . . . I needed to get some type of processes in place so that we could meet our deadlines . . . . [T]he annual leave denial did not just apply to Ms. Harris, but it applied to all staff including myself.").

Harris does not point to evidence challenging the existence of that policy or the explanation for it offered by Hubbard.[28] Rather, seeking to cast some doubt, Plaintiff contends that the stated reasons for *her own* leave denials were "vague" and not "fully communicated or understood," and from that a jury could infer retaliation. ECF No. 60 at 14. But Plaintiff acknowledged in her deposition that Hubbard repeatedly told her that her leave requests were denied because they fell during the busy end-of-fiscal-year closeout and asked her to reschedule her leave after the end of the fiscal year, i.e., October 1, 2020. ECF No. 60-2 at 77–79 (Harris testifying she was repeatedly told that her leave was denied because "we will be busy during year-end closeout"). Plaintiff did not indicate during her deposition that this explanation was vague, s*ee id.,* and the Court has no problem concluding that no reasonable jury could find that an employee with ten years of experience as a Budget Analyst, like Plaintiff, was confused when her supervisor told her that her leave was denied because "we will be busy during year-end closeout," *id.* at 77–78; *see also id.* at 27–29 (Harris testifying about what "closeout" at the end of the fiscal year means).

Plaintiff also asserts that Hubbard's policy of denial of annual leave requests during year-end closeout was "not consistently applied." ECF No. 60 at 14. Specifically, she asserts in her opposition that "*Harris'[] records* indicate that, despite the purported blanket restriction on leave,

---

[28] Plaintiff's opposition more generally asserts that alleged deviations from FEMA policies and procedures are evidence of pretext in this case. *See* ECF No. 60 at 24 ("FEMA's actions towards Ms. Harris deviated from its own policies and procedures, further suggesting that the adverse actions were not based on legitimate performance concerns but were instead retaliatory."). But Harris' assertion is conclusory; she provides no explanation as to which policies and practices she is referring to, or how Hubbard deviated from them in a way that is material to her claims.

some requests were approved during this critical period." *Id.* (emphasis added). To support this argument, she cites only her deposition testimony in which she explains that some of *her own* leave requests were approved by Hubbard during this period. *See id.* (citing ECF No. 60-2 at 90–91 (testifying that Hubbard approved Harris' requests for annual leave two times at the end of August 2020)).[29] But the fact that Hubbard approved some of Harris' leave requests during the close-out period provides no basis to support an inference that Hubbard was retaliating against her. If anything, that deviation *in Plaintiff's favor* from Hubbard's general policy of denial undermines her claim that Hubbard was retaliating against her with respect to leave denials. *See Felder*, 595 F.

---

[29] Not in her opposition brief but in her response to Defendants' statement of material facts, Plaintiff asserts that "Hubbard did not refuse the other's leave [sic] and [S.C.] took leave during her busy time in August." ECF No. 60-6, ¶ 22; *see also id.*, ¶ 65. In support, she cites a page from her declaration submitted as part of the EEO Report of Investigation wherein she states "[S.C.] has taken time off even in the midst of her formulation deadlines in relation to the RAP. Her leave was not denied." *Id.* (citing ECF No. 60-1 at 252). She provides no further explanation as to what that statement means or what it is based on. *See id.* Again, the Court need not address such "throwaway" arguments hidden in the parties' filings. *See Al-Tamimi*, 916 F.3d at 6 ("A party forfeits an argument by failing to raise it in its opening brief. Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (citations omitted) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (citing *Herron v. Fannie Mae*, 861 F.3d 160, 165 (D.C. Cir. 2017))); *Loumiet v. United States*, 65 F. Supp. 3d 19, 25 (D.D.C. 2014) ("[C]ourts will not make arguments for the litigants." (quoting *Oak Ridge Care Ctr., Inc. v. Racine Cnty.*, 896 F. Supp. 867, 876 (E.D. Wisc. 1995))). In any event, Harris' knowledge of the circumstances of S.C.'s leave appears to be based on "sheer hearsay"—that is, it is based on a conversation that Harris says she had with S.C. —which "counts for nothing" on summary judgment. *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007); *see also* ECF No. 60-2 at 92 (Harris testifying that her basis for knowledge about S.C.'s approved leave was based on a conversation with S.C.).

Although Plaintiff fails to cite it, there is some evidence that Hubbard approved leave for S.C. during the fiscal year closeout. Hubbard testified at her deposition that she "may have" approved "one or two days" off for S.C., although she could not "remember the exact time frame." ECF No. 60-4 at 72. But Hubbard explained that Plaintiff and S.C. had different job functions and S.C. did not have the same deadlines associated with fiscal year-end closeout as Plaintiff. *See* ECF No. 60-4 at 72 ("Ms. Harris had a lot of deadlines approaching our fiscal year-end, whereas [S.C.] did not have all of those deadlines."). As explained above, S.C. is not an appropriate comparator; it is uncontested that S.C. worked in budget formulation—not budget execution, like Plaintiff—which differed in terms of the roles, workload, and, most critically here, deadlines that budget execution faced at the end of the fiscal year. ECF No. 60-2 at 92–93; *see also id.* at 201. Even according to Plaintiff her "role[] [was] just completely different [from S.C.'s]. [Plaintiff's] role was busy all the time." *Id.* at 93. More, in S.C.'s declaration, she was asked, "Do you believe sex, age, race and retaliation were factors in [Harris'] supervisor denying her leave on multiple dates from July to September 2020?" *Id.* at 918. S.C. responded, "No, because I think the leave cancelation was related to fiscal year-end activities for which [Harris] was the lead analyst performing these duties." *Id.* . For these reasons, even were the Court to consider Plaintiff's perfunctory argument in this regard, and even were it to find that there is sufficient evidence in the record that Hubbard granted S.C.'s leave requests during the year-end closeout, it would still find that Plaintiff has not provided a sufficient evidentiary basis for a reasonable jury to conclude that Hubbard's policy of denying leave requests during the year-end closeout was not consistently applied.

Supp. 2d at 75 (finding that the plaintiff failed to cast doubt on the employer's asserted non-retaliatory reasons by pointing to inconsistencies in policy when the deviation from policy "affirmatively *benefitted*" the plaintiff (emphasis in original)).

In the sum, Plaintiff ultimately offers nothing other than temporal proximity with respect to the leave denials at issue. *See* ECF No. 60 at 35 ("These [leave] denials came at a time when Harris had engaged in protected activities, suggesting that the refusal to grant leave was not based on operational requirements but rather on a desire to penalize her for her complaints."); ECF No. 60-6, ¶ 37("Arlene Harris was denied leave requests repeatedly between July and August 2020, immediately following her EEO complaint."). And, at this stage, temporal proximity is not enough for a reasonable jury to find retaliation. *Allen*, 795 F.3d at 47. Accordingly, summary judgment will be granted with respect to these adverse actions.

> d.    *Plaintiff's evidence is insufficient for a reasonable jury to find pretext or a retaliatory motive when Hubbard allegedly required her to work during scheduled time off or through lunch breaks.*

Plaintiff's final contention is that Hubbard retaliated against her when she required Harris to work during her scheduled time off or through her lunch breaks without compensation on June 5, 2020, June 19, 2020, and July 14, 2020. *See* ECF No. 60 at 28–29; ECF No. 60-2 at 112; ECF No. 60-1 at 212–14. The Court finds that Plaintiff has not met her burden of showing that a reasonable jury could find in her favor with respect to these adverse actions.

While they vary in their details, Plaintiff acknowledged in her deposition that each of these incidents share the same alleged core facts: although Hubbard never expressly told Harris to work through lunch or on her scheduled time off, the work deadlines Hubbard imposed on the given day necessitated Harris doing so. *See* ECF No. 60-2 at 113–14 (Harris testifying that while Hubbard never explicitly instructed her to do so, that her intent was clear because "[t]he tasks [she assigned]

were too large to get them done in [the] time frame" she imposed without Harris working on her time off).  Contrary to the government's suggestion, however, the fact that Hubbard never explicitly instructed Harris to work on her time off on these days is not dispositive.  *See* ECF No. 55-1 at 12–13; ECF No. 61 at 24.  Indeed, if Harris is believed by the fact finder, a reasonable jury could infer that such a directive was implicitly issued by Hubbard based on the demanding workload and deadlines imposed.  *See* ECF No. 60 at 28.  But even assuming Plaintiff's version of events is true, that merely proves that the adverse employment action she alleges—that she was required to work during her lunch breaks or on her scheduled time off—occurred.  Proving that does not prove retaliation—however unpleasant enduring those adverse actions may have been for Plaintiff.  (And no doubt almost missing her niece's graduation on June 5, 2020, was very unpleasant for Plaintiff.)  In every retaliation case—even those involving employment actions more trying than what Harris endured here (a termination, for example)—the plaintiff must not only prove that the adverse action occurred but also that it was caused by a retaliatory motive.  *See Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation.").  On that score, Plaintiff's evidentiary showing suffers from the same deficiencies noted with respect to the other adverse employment actions at issue:  namely, that her evidence of retaliation boils down to temporal proximity.  *See* ECF No. 60 at 3 ("[T]he close temporal proximity between plaintiff's EEO complaint . . . and [the requirement that she work on her scheduled time off or through lunch breaks] in early June 2020 and beyond, raises a genuine issue of material fact regarding the retaliatory nature of these actions."); ECF No. 60-6, ¶ 36 ("Within two weeks of filing the EEO complaint, Arlene Harris was required to work on scheduled days off without compensation.").  At the risk of beating the dead horse, the Court observes again that, in this Circuit, after "an employer has put forth legitimate, non-retaliatory reasons for a challenged

action, 'positive evidence *beyond mere proximity* is required to defeat the presumption that the proffered explanations are genuine.'" *Allen*, 795 F.3d at 47 (emphasis added) (quoting *Hamilton*, 666 F.3d at 1359). That proscription is even more apt here because there is no record evidence that Hubbard had knowledge of Plaintiff's EEO activity until some six months after the adverse actions at issue occurred. *See Talavera*, 638 F.3d at 313; *Dudley,* 924 F. Supp. 2d at 182 (observing that "[i]t is hard to argue that the employer punished plaintiff because of plaintiff's protected activity, if the employer was completely unaware of plaintiff's protected activity" (emphasis omitted)).

Here, Hubbard has provided a legitimate, non-retaliatory reason for the actions at issue: she believed the work assigned was not so onerous as to require Plaintiff to work through her lunch breaks or on scheduled time off, and to the extent that did occur, it was because Plaintiff had issues with time management. *See* ECF No. 60-4 at 129–30; *see also* ECF No. 60-1 at 803–04 (Hubbard averring that "[w]hat I found during my observation coming on board, was that Ms. Harris would be given a task at the beginning of the day and then she would take all day to complete the task that required maybe an hour of her time. . . . Ms. Harris is a GS-14 and is supposed to be a seasoned budget analyst and with this, she has the knowledge and skill set to complete her assigned duties within the required timeframe. Ms. Harris constantly requested overtime . . . more so than anyone within the crew, but with no productivity to back it up."). Not surprisingly, Harris disagrees with that assessment. *See* ECF No. 60 at 29 ("The government's claim that the work did not necessitate overtime is challenged by Harris' perception and response to the workload."); *id.* ("The fact that Harris *felt compelled* to work outside normal hours to complete her tasks suggests a disconnect between the assigned workload and the time realistically required to complete it.") (emphasis added)). But her subjective disagreement with her supervisor's evaluation of her job

performance—including her difference of opinion about how long various tasks she was assigned should have taken to complete—does not undermine Hubbard's honest belief that Plaintiff's workload should not have required her working on her time off if she was as efficient as someone of her experience should have been.[30]  *Ey*, 967 F. Supp. 2d at 344 ("[T]he plaintiff's own disagreement with his supervisor's view is certainly not sufficient to establish pretext . . . ."); *Pereira*, 2024 WL 450241, at *4 (plaintiff's "subjective disagreement with his supervisor is of no moment"). When challenging an employer's non-retaliatory explanation for its actions, again, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Vatel*, 627 F.3d at 1247 (quoting *Hawkins*, 203 F.3d at 280);  *Walker*, 798 F.3d at 1094 (plaintiff "points to nothing other than her own opinion of her performance to dispute [her employer's] evaluation," and her "own personal opinion is inadequate by itself to create an issue for the jury").  That principle is no less applicable to supervisors whose management style is, as Harris asserts in describing Hubbard's, "direct" and "challenging."  ECF No. 60 at 9; *see, e.g.*, *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 47 (D.D.C. 2017) ("Title VII does not protect employees from bad managers

---

[30] Plaintiff argues in her statement of material facts—though not in her opposition brief—that Hubbard's assertion that the workload assigned to Harris could have been completed in an eight-hour workday is contradicted by the "subsequent *hiring of additional staff to alleviate the workload* initially assigned to Ms. Harris, indicating a misjudgment of the workload's scope."  ECF No. 60-6, ¶ 60 (emphasis added).  But in the very next paragraph of her statement of material facts, Plaintiff asserts that this "redistribution of duties" was a "*stripping of responsibilities* from [her] and assigning them to new staff *without justification*," and claims the reassignment of duties was further evidence of "disparate treatment."  *Id.*, ¶ 61 (emphasis added).  Plaintiff cannot have it both ways.  Hubbard's reassignment of some of her duties to newly hired staff cannot both be an effort to "alleviate [her] workload," *id.*, ¶ 60, and a retaliatory "stripping of her responsibilities . . . without justification," *id.*, ¶ 61.  Perhaps this is why Plaintiff did not advance these arguments in her opposition brief.  Again, the Court need not address such undeveloped, self-contradictory arguments.  *Al-Tamimi*, 916 F.3d at 6 ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider*, 412 F.3d at 200 n.1); *Loumiet v. United States*, 65 F. Supp. 3d 19, 25 (D.D.C. 2014) ("[C]ourts will not make arguments for the litigants." (quoting *Oak Ridge Care Ctr., Inc. v. Racine Cnty.*, 896 F. Supp. 867, 876 (E.D. Wisc. 1995))); *James v. Miche Bag Corp.*, No. 11-cv-963, 2012 WL 13072049, at *2 (D.D.C. Mar. 30, 2012) ("The Court is not obliged to make arguments on [a party's] behalf.").  In any event, Plaintiff's assertion that because some of her duties were assigned to multiple new hires necessarily means she could not complete her work in an eight-hour workday is a non-sequitur and ignores Hubbard's testimony that the new hires had other duties as well, including analyzing data to make recommendations to leadership—data Plaintiff had previously been collecting but not analyzing.  *See* ECF No. 60-4 at 113–14.

or workplace conflicts unconnected to discrimination; sometimes people just do not get along.");

*see also, e.g.*, *Qashu v. Bliken*, No. 22-cv-1077, 2024 WL 3521592, at *9 (D.D.C. July 24, 2024)

(noting "federal law does not ban unpleasant workplaces without some connection to a protected

characteristic" and finding the plaintiff had not provided any evidence on "that second element"),

*appeal filed*, No. 24-5201 (D.C. Cir. Sept. 5, 2024); *Bailey v. DAS N. Am., Inc.*, 473 F. Supp. 3d

1310, 1329 (M.D. Ala. 2020) (finding that evidence demonstrating that a supervisor "may have

been uncivil, unpleasant, unprofessional and a horrible boss[] . . . does not make her a discrimina-

tory one").  The issue, rather, "is not the correctness or desirability of the reasons offered but

whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (D.C.

Cir. 1996); *Kelly v. Mills*, 677 F. Supp. 2d 206, 228-29 (D.D.C. 2010) (courts do not concerns

themselves with whether an employer's actions were "wise, fair, or correct" when they consider

whether an employer's explanation may have been pretextual (quoting *Crocket v. Richardson*, 127

F. Supp. 2d 40, 47 (D.D.C. 2001)).

The Court finds Plaintiff has made no showing to undermine Hubbard's honest belief in

her proffered reasons with respect to Harris having to work during her lunch breaks or scheduled

time off.  In the few pages of her opposition that she devotes to this issue, Plaintiff fails to identify

any record evidence—other than her own subjective "perception and response to the workload,"

ECF No. 60 at 29—that would permit a jury to doubt the sincerity of Hubbard's stated reasons.

*See id.* at 12–13, 28–30, 34–35.  But a party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.

Indus. Co.*, 4785 U.S. at 587.  Indeed, Plaintiff acknowledges that the year-end closeout period

was "busy," that there was a time-sensitive deadline approaching the Monday after the June 5

incident, and that Hubbard had "urgent calls and requests" for her to address on June 19, placing

Hubbard's seemingly "unrelenting" demands in context. *See* ECF No. 60-2 at 29 (Harris testifying that year end closeout was "busy, but I would not say that it's not necessarily—it's more busy, but in different way because the year is always busy, all year."); *id.* at 103 (testifying that "it was a busy week [during the June 5, 2020, incident]. Again, . . . [it was the] busy season . . . trying to get all of the funds committed . . . . [E]verything that is not committed by Monday the 8th, then the components run the risk of losing those funds"); ECF No. 60-1 at 212 (Harris averring that on Friday, June 19, 2020, she "had to respond to several unscheduled but urgent calls and requests including from [Hubbard]"); *see also* ECF No. 60 at 18–19 (Harris arguing that an email Hubbard sent on September 18, 2020, informing Smith that she was going to pursue a PIP and termination of Plaintiff, "highlight[ed] [Hubbard's] frustrations with the situation, especially given the operational pressures at the fiscal year-end").

Nor has Plaintiff presented evidence from which a reasonable jury could conclude that she was otherwise targeted by Hubbard for her EEO activity in the assignments that Hubbard gave her. Beyond the lack of evidence of Hubbard's knowledge of that activity, Harris has proffered no similarly situated employees whom Hubbard treated differently than she treated Harris in this regard. To the extent the issue was Hubbard's failure to approve sufficient overtime for Harris to get her job done, *see* ECF No. 60-6, ¶ 64; ECF No. 60-2 at 103–07, it is undisputed that the requirement that Harris' overtime and comp time be preapproved, and the limits placed on it, were practices implemented prior to Hubbard coming to FEMA. *See supra* note 7; ECF No. 60-1 at 212 (Harris stating in her EEO declaration, that, prior to Hubbard starting at FEMA, a different supervisor "approached [Harris] about Amber Smith being appalled at all of the comp time that [Harris] had accumulated," and, at that time, Harris was "told verbally to stop all overtime"). Hubbard

continuing those practices after she became Harris' supervisor is hardly evidence of retaliatory motive.

Nor has Plaintiff presented any evidence that a retaliation-minded Hubbard was setting her up to fail with the assignments that she gave her. *See* ECF No. 60 at 29–30; ECF No. 60-6, ¶ 63. In fact, Plaintiff admitted in her deposition that Hubbard hired additional staff to assist her after she complained about her workload and stated she needed additional help. *See* ECF No. 60-2 at 160–63 (Harris testifying that Hubbard told her "I'm going to get you some help because I know you're busy" and then confirming that Hubbard hired at least two additional staff and assigned some of her duties to them). There is also evidence in the record that Hubbard scheduled one-on-one meetings with Harris to recommend management training courses and paid for Harris to attend at least one course. *See* ECF No. 60-4 at 45 (Hubbard testifying that she "made recommendations for some training for her to attend management concepts" and "even scheduled her and paid for the courses"). This evidence further bolsters an ultimate finding in favor of Defendants on their motion because it suggests that Hubbard was actively trying to help Harris with her workload and with what Hubbard perceived as Harris' performance and time management issues, not retaliate against her. *See Congress*, 643 F. Supp. 3d at 236 (finding that evidence showing the employer's "efforts to help" the plaintiff succeed undermined his argument that management imposed requirements at which he was "doomed to fail"); *see also Aka*, 156 F.3d at 1289 (stating that, in addition to evidence provided by a plaintiff, the Court may consider any "contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)"). Accordingly, the Court will grant summary judgment on Plaintiff's claim related to Hubbard requiring her to work during her scheduled time off or through her lunch breaks without compensation.

*    *    *    *    *

In sum, the Court concludes that Plaintiff has not presented sufficient "positive evidence beyond mere proximity" necessary "to defeat the presumption that [Hubbard's] proffered explanations are genuine" and the true explanation is retaliation. *Talavera*, 638 F.3d at 313 (quoting *Woodruff*, 481 F.3d at 530). Nor could a reasonable jury find that Hubbard "acted, at least in part, for a prohibited reason," *Walker*, 798 F.3d at 1096, especially given her uncontested testimony that she did not know of Harris' protected EEO activity at the time. Accordingly, summary judgment will be granted in favor of Defendants.

## IV.    CONCLUSION

For the reasons set forth herein, the Court will issue an order contemporaneously with this Memorandum Opinion granting Defendants' motion for summary judgment.

Date: March 26, 2025

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE